CARLSMITH BALL LLP

TOM E. ROESSER                    3241
ERIKA S. GUSTIN                   11188
ASB Tower, Suite 2100
1001 Bishop Street
Honolulu, HI 96813
Tel No. 808.523.2500
Fax No. 808.523.0842
troesser@carlsmith.com
egustin@carlsmith.com

Attorneys for Creditor
U.S. BANK NATIONAL ASSOCIATION,
AS TRUSTEE FOR VELOCITY
COMMERCIAL CAPITAL LOAN
TRUST 2018-2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| In re | CASE NO. 21-00952 (Chapter 13) |
|---|---|
| STEVEN MICHAEL WARSH, | U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION FOR ORDER CONFIRMING THAT AUTOMATIC STAY AND CO-DEBTOR STAY ARE NOT APPLICABLE; MEMORANDUM IN SUPPORT OF MOTION; |
| Debtor. | |
| | *(caption continued)* |
| | **Hearing:** *See Notice of Hearing* JUDGE: Honorable Robert J. Faris |

## U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION FOR ORDER CONFIRMING THAT AUTOMATIC STAY AND CO-DEBTOR STAY ARE NOT APPLICABLE

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2 ("**U.S. Bank**" or "**Creditor**"), by and through its attorneys Carlsmith Ball LLP, respectfully moves this Court for an order authorizing U.S. Bank to proceed with a foreclosure action against certain property owned by Maui Meadows Management LLC, a Hawaiʻi limited liability company ("**Maui Meadows**"), which is secured by a mortgage lien in favor of U.S. Bank, on the grounds that (a) the automatic stay of Section 362 of the Bankruptcy Code does not apply because the subject property is owned by Maui Meadows rather than the Debtor STEVEN MICHAEL WARSH (the "**Debtor**"), and (b) that the co-debtor stay of Section 1301 of the Bankruptcy Code does not apply because the loan to Maui Meadows was for a business purpose. U.S. Bank further requests such other and further relief as is deemed just and proper.

This Motion is brought under Sections 105(a), 362(d)(1) and 1301 of the Bankruptcy Code, Rule 9013 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 4001-5 and 9013-1, and is based upon the Notice of Motion, Memorandum in Support of Motion, the Declarations of Gloria-Jane Meyer and Erika S. Gustin, and Exhibits filed concurrently herewith and on such further argument and evidence as may be submitted at or before the hearing on the Motion.

DATED:  Honolulu, Hawaiʻi, October 28, 2021.


*/s/ Tom E. Roesser*
TOM E. ROESSER
ERIKA S. GUSTIN

Attorneys for Creditor
U.S. BANK NATIONAL
ASSOCIATION, AS TRUSTEE FOR
VELOCITY COMMERCIAL
CAPITAL LOAN TRUST 2018-2

# TABLE OF CONTENTS

**Page**

I.         INTRODUCTION ...................................................................1

II.        RELEVANT FACTS ...........................................................1

III.       ANALYSIS .........................................................................5

      A.    The Automatic Stay Does Not Apply to the Property .........................5

      B.    The Co-debtor Stay of Section 1301 Does Not Apply........................7

IV.       CONCLUSION ................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barker v. Gottlieb*,
23 F.Supp.3d 1152 (D. Haw. 2014)...................................................................7

*In re Benz*,
368 B.R. 861 (B.A.P. 9th Cir. 2007) ............................................................6, 7

*In re Bushkin*,
No. 2:11-BK-43502-DS, 2016 WL 4040679 (B.A.P. 9th Cir. July
22, 2016) ...........................................................................................................8

*In re Cherrett*,
873 F.3d 1060 (9th Cir. 2017) .........................................................................9

*In re Chrisman*,
27 B.R. 648 (Bankr. S.D. Ohio 1982) ..............................................................8

*In re Circle Five, Inc.*,
75 B.R. 686 (Bankr. D. Idaho 1987)..................................................................8

*In re Coupon Clearing Serv., Inc.*,
113 F.3d 1091 (9th Cir. 1997) .........................................................................6

*In re Demaree*,
27 B.R. 1 (Bankr. D. Or. 1982) ........................................................................8

*In re Gendreau*,
122 F.3d 815 (9th Cir. 1997) ...........................................................................6

*In re Grillot*,
578 B.R. 651 (Bankr. D. Kan. 2017)...............................................................11

*In re Kelly*,
841 F.2d 908 (9th Cir. 1988) ...........................................................................8

*In re La Flamme*,
13 B.R. 278 (Bankr. N.D. Ga. 1981) ................................................................8

*Matter of Nenninger*,
    32 B.R. 624 (Bankr. W.D. Wis. 1983) ..................................................8

*In re Nicolas*,
    No. 02-00211, 2002 WL 32332461 (Bankr. D. Haw. Mar. 22,
    2002) ....................................................................................................9

*In re Panaia*,
    65 B.R. 865 (Bankr. D. Mass. 1986) ......................................................8

*In re Stein*,
    18 B.R. 768 (Bankr. S.D. Ohio 1982) ....................................................9

**Statutes**

11 U.S.C.A. § 101(8) ..................................................................................8

11 U.S.C.A. § 362 ...........................................................................1, 5, 7, 12

11 U.S.C.A. § 541(a)(1) ..............................................................................6

11 U.S.C.A. § 1301 ...........................................................................1, 7, 12

Haw. Rev. Stat. § 428-501(a) ....................................................................6

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>STEVEN MICHAEL WARSH,<br><br>      Debtor. | CASE NO.  21-00952<br>(Chapter 13)<br><br>MEMORANDUM IN SUPPORT OF MOTION |

## MEMORANDUM IN SUPPORT OF MOTION

## I.  INTRODUCTION

Debtor STEVEN MICHAEL WARSH (the "**Debtor**") filed this Chapter 13 bankruptcy case in bad faith for the sole purpose of delaying a foreclosure auction of real property he does not own.  Since the Debtor has no ownership interest in the subject property, that property is not property of his bankruptcy estate and the automatic stay of Section 362 of the Bankruptcy Code is inapplicable.  And because the loan to Maui Meadows was for a business purpose, the co-debtor stay of Section 1301 is similarly inapplicable.

## II.  RELEVANT FACTS

On or about March 27, 2018, for and in consideration of a loan made by Velocity Commercial Capital, LLC ("**Velocity**") to Maui Meadows Management LLC ("**Maui Meadows**") in the principal sum of ONE MILLION, FIFTY

THOUSAND DOLLARS AND NO/100 DOLLARS ($1,050,000.00), Maui Meadows made, executed and delivered to Velocity a Semi-annual Adjustable Term Note ("**Note**"). *See* Declaration of Gloria-Jane Meyer ("**Meyer Declaration**") at ¶ 7; Exhibit 1 (Note).

The Debtor, in his individual capacity, executed and delivered to Velocity the Unlimited Guaranty dated March 27, 2018 ("**Guaranty**"), of which U.S. Bank National Association, As Trustee For Velocity Commercial Capital Loan Trust 2018-2 ("**U.S. Bank**") is now the holder. Under the Guaranty, the Debtor absolutely, unconditionally, and irrevocably guaranteed the full and punctual payment of all sums due and owing under the Note. *See* Meyer Declaration at ¶ 10; Exhibit 3 (Guaranty).

For the purpose of securing payment of the principal sum, interest, and all other charges as provided for in the Note, Maui Meadows made, executed, and delivered to Velocity that certain Mortgage dated and recorded March 27, 2018 in the Bureau of Conveyances of the State of Hawaiʻi as Document No. A-66670104 ("**Mortgage**"), which encumbers that certain parcel of land situated at 3343 Keha Drive, Kihei, Maui, Hawaiʻi 96753, being Lot 234, area 0.538 acres, more or less, as delineated on the map entitled "MAUI MEADOWS SUBDIVISION, UNIT III", which said map was filed in the Bureau of Conveyances of the State of Hawaiʻi as

File Plan No. 1236, and being designated as Tax Map Key No. 2-2-1-019-003 ("**Property**").  *See* Meyer Declaration at ¶¶ 8-9; Exhibit 2 (Mortgage).

On or about August 27, 2019, Velocity executed an Allonge to $1,050,000.00 Promissory Note dated March 27, 2018 ("**Allonge**") and an Assignment of Collateral Agreements and Other Loan Documents ("**Collateral Assignment**"), transferring all right, title, and interest of Velocity in and to the Note and associated loan documents to U.S. Bank.  *See* Meyer Declaration at ¶ 11; Exhibits 4 (Allonge) and 5 (Collateral Assignment).  Velocity subsequently endorsed the Note to U.S. Bank; and U.S. Bank is the owner of and holder of the Note, which its counsel has in its physical possession.  *See* Meyer Declaration at ¶ 12.  Under the terms of the Note, Maui Meadows promised to repay to U.S. Bank any and all monies due and owing under the Note, plus interest and allowable charges.

Velocity also executed an Assignment of Commercial Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing to U.S. Bank on October 30, 2020 ("**Assignment**").  Said Assignment was recorded in the State of Hawai'i Bureau of Conveyances on November 2, 2020 as Document No. A-76110379.  *See* Meyer Declaration at ¶ 13; Exhibit 6 (Assignment).

Maui Meadows has been in default under the Note and Mortgage since May 1, 2020.  As a result of Maui Meadows' default, U.S. Bank exercised its option to

declare the entire balance of the Note, together with interest, to be immediately due and payable. Although U.S. Bank made demand upon Maui Meadows for all amounts owing under the Note, Maui Meadows failed and continued to fail to pay the sums owing under the Note. *See* Meyer Declaration at ¶¶ 14-19.

On February 12, 2021, U.S. Bank commenced a foreclosure action against Maui Meadows in Civil No. 2CCV-21-0000046, Circuit Court of the Second Circuit, State of Hawaiʻi (the "**Foreclosure Action**"). The Debtor was named as a Defendant in the Foreclosure Action solely because of his liability under the Guaranty. The Debtor does not now, and has never, held any ownership interest in the Property.

U.S. Bank obtained a summary judgment against Maui Meadows and the Debtor in the Foreclosure Action. Attached as Exhibit 11 to the Declaration of Erika S. Gustin (the "**Gustin Declaration**") is a copy of the *Findings of Fact, Conclusions of Law, and Order Granting Plaintiff U.S. Bank National Association, as Trustee for Velocity Commercial Capital Loan Trust 2018-2's Motion for Summary Judgment As To All Defendants And for Interlocutory Decree of Foreclosure filed June 21, 2021; Exhibit "A"* (the "**Summary Judgment Order**"); *See* Gustin Declaration, ¶ 4; Exhibit 11 (Summary Judgment Order).

In accordance with the Summary Judgment Order, Shackley F. Raffetto was appointed Commissioner to take possession of the Property and sell it at public

auction. However, Maui Meadows and the Debtor informed the Commissioner that they would refuse to cooperate in holding open houses. That required U.S. Bank to file a Motion to Sell Without Open Houses in the Foreclosure Action, which was granted by the Circuit Court. *See* Gustin Declaration, at ¶ 5; Exhibit 12 (Order Granting Motion to Sell Without Open Houses).

The Commissioner then scheduled an auction of the Property for October 20, 2021. The Debtor waited until October 15, 2021 before filing a Chapter 13 Bankruptcy case for the sole purpose of further delaying the auction. Although the Property is not owned by the Debtor, in an abundance of caution U.S. Bank postponed the October 20, 2021 auction, and seeks the relief requested in this Motion.

## III. ANALYSIS

### A. The Automatic Stay Does Not Apply to the Property.

Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay of the commencement or continuation of a judicial action or proceeding against the debtor or property of the estate. U.S. Bank will not take any action against the Debtor to enforce the terms of the Guaranty without first obtaining relief from the stay for that purpose. However, U.S. Bank is entitled to continue the foreclosure action against Maui Meadows

because Maui Meadows owns the Property, and the Property is therefore not property of the Debtor's estate.

Section 541(a)(1) of the Bankruptcy Code generally provides that "all legal or equitable interests of the debtor in property as of the commencement of the case" is property of the Debtor's bankruptcy estate. Although the scope of the bankruptcy estate is broad, "the property of the estate **cannot exceed whatever interests a debtor holds at the commencement of a case**." *In re Benz*, 368 B.R. 861, 866 (B.A.P. 9th Cir. 2007) (emphasis added). "The nature and extent of a debtor's interest in property is determined by state law, with the estate having no greater rights in property than those held by the debtor prior to bankruptcy." *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997); *see also In re Gendreau*, 122 F.3d 815, 819 (9th Cir. 1997) ("Bankruptcy recognizes state property rights, and filing bankruptcy cannot give a debtor a greater interest in an asset than that which he owned pre-bankruptcy.")

The Property which is the subject of the Foreclosure Action **is owned by Maui Meadows**. U.S. Bank obtained a title report on the Property prior to commencing the Foreclosure Action, which shows Maui Meadows as the legal owner of the Property in fee simple. *See* Gustin Declaration at ¶ 6; Exhibit 13 at 2-3 (Litigation Guarantee). The Debtor merely is a member of Maui Meadows. Under Hawai'i law, a member of a limited liability company "is not a co-owner of,

and has no transferable interest in, property of a limited liability company."  Haw. Rev. Stat. § 428-501(a); *see also Barker v. Gottlieb*, 23 F.Supp.3d 1152, 1163 (D. Haw. 2014) (discussing Haw. Rev. Stat. § 428-501(a) in the context of real property).

Thus, the Debtor does not own the Property.  The fact that the Debtor owns the LLC membership interests of Maui Meadows does not constitute either a legal or an equitable interest in the Property.  After all, owning shares of Microsoft does not make a person a legal or equitable owner of property that Microsoft owns.  Those membership interests are property of the Debtor's estate, but no action is being taken by U.S. Bank to obtain possession of those membership interests.

In sum, the Property is not part of the Debtor's bankruptcy estate because "the property of the estate cannot exceed whatever interests a debtor holds at the commencement of a case."  *In re Benz*, 368 B.R. at 866.  The Debtor does not hold, and has never held, an interest in the Property.  Because the Property is not property of the Debtor's estate, the automatic stay of Section 362(a) is inapplicable.

### B.    The Co-debtor Stay of Section 1301 Does Not Apply.

The co-debtor stay of Section 1301 does not apply to Maui Meadows.  By its terms, § 1301(a) applies only to "consumer debts."  Thus, the threshold issue in determining whether the automatic stay applies is whether the subject debt

qualifies as a "consumer debt." As defined by the Bankruptcy Code, "[t]he term 'consumer debt' means debt incurred by an individual **primarily for a personal, family, or household purpose**." 11 U.S.C.A. § 101(8) (emphasis added).

In contrast, "[d]ebt incurred *for business ventures or other profit-seeking activities* is plainly not consumer debt[.]" *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988) (citing *In re Bell*, 65 B.R. 575, 577 (Bankr. E.D. Mich. 1986)) (emphasis added). Courts routinely hold that debts incurred primarily *for a business purpose* do not meet the definition of "consumer debt." *See, e.g. In re Demaree*, 27 B.R. 1, 2 (Bankr. D. Or. 1982) (debt incurred for primarily business purposes is not a consumer debt); *In re Chrisman*, 27 B.R. 648, 649 (Bankr. S.D. Ohio 1982) (same); *In re La Flamme*, 13 B.R. 278, 279 (Bankr. N.D. Ga. 1981) (same).

Moreover, "debts incurred on real property for business purposes cannot be consumer debts." *In re Panaia*, 65 B.R. 865, 869 (Bankr. D. Mass. 1986). That is true even where, as here, the debtor resides at the property. *See, e.g., In re Bushkin*, No. 2:11-BK-43502-DS, 2016 WL 4040679, at *8 (B.A.P. 9th Cir. July 22, 2016) (home loan properly characterized as business debt where debtor's primary purpose in obtaining the loan was for business). "[T]he test is **not the experience of the debtor, but the purpose of the loan**." *Matter of Nenninger*, 32 B.R. 624, 625 (Bankr. W.D. Wis. 1983) (emphasis added). "Debt used to produce income is not a consumer debt[.]" *In re Circle Five, Inc.*, 75 B.R. 686, 688 (Bankr.

D. Idaho 1987) (real estate loan used for family farm operation does not constitute consumer debt); *see also In re Stein*, 18 B.R. 768, 769 (Bankr. S.D. Ohio 1982) (same).

As this Court has stated:

> It is settled in this circuit that the purpose for which the debt was incurred affects whether it falls within the statutory definition of "consumer debt" and that the **debt incurred for business ventures or other profit-seeking activities does not qualify**.

*In re Nicolas*, No. 02-00211, 2002 WL 32332461, at *2 (Bankr. D. Haw. Mar. 22, 2002) (quoting *In re Hill*, 268 B.R. 548, 552 (B.A.P. 9th Cir. 2001)) (emphasis added). In applying that profit-motive test, "[t]he determination of whether a debt relates to a personal, family, or household purpose or is motivated by profit-seeking is made at the time the debt is incurred." *Id.* (citing *In re Bertolami*, 235 B.R. 493, 497 (Bankr. S.D. Fla. 1999)); *accord In re Cherrett*, 873 F.3d 1060, 1067 (9th Cir. 2017).

Here, there can be no dispute that the subject debt is a commercial loan made primarily for business purposes. Critically, Warsh's Petition admits that he does <u>not</u> have primarily consumer debt. *See* Petition [ECF No. 1] at 6, § 16; *id.* at 8, § 7; *id.* at 37, § 6.

Moreover, at the time Maui Meadows incurred the debt, it had a profit-seeking motive. At loan origination, Maui Meadows represented that the loan

**exclusively** was for a business purpose, and affirmed that representation across multiple key documents.

As shown on the Note:

> The Borrower represents to the Lender that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.

*See* Exhibit 1 at 3.

Additionally, the Mortgage itself states that it is a **commercial** mortgage. *See* Exhibit 2 at 1, 2. Therein, Maui Meadows represented and warranted that "[e]ach Obligation **is a commercial obligation and does not represent a loan used for personal, family or household purposes and is not a consumer transaction**." *See id.* at § 2.1(e) (emphasis added); *see also id.* at § 1.6 (defining "Obligation" as any amount owed by the Mortgagor to the Lender).

Maui Meadows also signed a Business Purpose of Loan Certification. That Certification unequivocally states:

> 2.    Lender has stressed the importance of knowing the primary purpose of this Loan. Borrower understands that the legal responsibilities of Lender vary considerably depending upon whether a loan is a consumer loan, which is for personal, household or family purposes, or a business loan, which is for every other purpose.
>
> 3.    Borrower has previously represented to Lender, and hereby represents again in this certification to Lender, its successors and assigns, that ALL of the purposes of the Loan, exclusive of commissions and loan expenses incurred to obtain the Loan are for business purposes.
>
> 4.    No part of the Loan proceeds are intended to be used for a non-business (i.e., consumer) purpose.
>
> Borrower(s) declare(s) under penalty of perjury that the foregoing is true and correct.

*See* Meyer Declaration at ¶ 20; Exhibit 7 (Business Purpose of Loan Certification).[1]

Finally, on the original Loan Application, Maui Meadows specifically designated the subject property as "rental being held for income." *See* Meyer Declaration at ¶ 22; Exhibit 9 at 3 (Loan Application).

Maui Meadows, through its managing member Warsh, signed each of those documents. It is clear and undisputed that Maui Meadows sought the loan for a business purpose and with a rental profit-seeking motive. *See* Meyer Declaration at ¶ 23; Exhibit 10 (Leases); *see also* Petition [ECF No. 1] at 30 (listing debtor's occupation as rental property management); *id.* at 56 (showing rental income on subject property of $13,065.00 per month). The fact that Warsh resides at the property does not change the purpose of the loan. Accordingly, the loan does not qualify as consumer debt.[2] The automatic stay does not apply.

---

[1] Although the Debtor apparently resides at the Property (*see* ECF No. 1 at 2), he also signed a Certification of Occupancy Disclosure declaring, under penalty of perjury, that he "[did] not intend to occupy the Property and the Loan is to acquire, improve, or maintain rental property[.]" *See* Meyer Declaration at ¶ 21; Exhibit 8 (Certification of Occupancy Disclosure). That Certification further avers that the Debtor "ha[d] no intention of ever making the Property securing the loan his … principal residence" and that neither the Loan proceeds nor the Property would be used for personal, family, or household purposes. *See id.*

[2] Additionally, "[a]n individual's guaranty of a business or commercial debt is generally a non-consumer debt." *In re Grillot*, 578 B.R. 651, 657 (Bankr. D. Kan. 2017) (citing cases). Thus, any argument that the stay applies by virtue of the Guaranty executed by Warsh would be unavailing.

## IV.   **CONCLUSION**

Based on the foregoing, U.S. Bank respectfully requests that this Court grant

this Motion and enter an Order:

  (i)     finding that the automatic stay of Section 362(a) does not apply because the Property is not property of the Debtor's bankruptcy estate;

  (ii)    finding that the co-debtor stay of Section 1301 does not apply because the loan from U.S. Bank is not consumer debt;

  (iii)   awarding U.S. Bank its attorney's fees and costs incurred in filing the present motion; and

  (iv)   granting such other and further relief as this Court deems just and proper.

DATED:  Honolulu, Hawai'i, October 28, 2021


*/s/ Tom E. Roesser*
TOM E. ROESSER
ERIKA S. GUSTIN

Attorneys for Creditor
U.S. BANK NATIONAL ASSOCIATION, AS
TRUSTEE FOR VELOCITY COMMERCIAL
CAPITAL LOAN TRUST 2018-2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>STEVEN MICHAEL WARSH,<br><br>      Debtor. | CASE NO.  21-00952<br>(Chapter 13)<br><br>DECLARATION OF GLORIA-JANE MEYER;<br>EXHIBITS "1" –"10" |

## <u>DECLARATION OF GLORIA-JANE MEYER</u>

I, GLORIA-JANE MEYER, declare:

1.     I am the Special Asset Manager of Velocity Commercial Capital, LLC ("**Velocity**"), which is the lender of the subject loan and services the loan on behalf of Plaintiff U.S. Bank National Association, as Trustee for Velocity Commercial Capital Loan Trust 2018-2 ("**U.S. Bank**").

2.     I am familiar with the policies and practices of Velocity, including its business records and system for keeping track of loans and loan balances for mortgage loans.

3.     I, among others, have been involved on behalf of U.S. Bank in dealings with Maui Meadows Management, LLC ("**Maui Meadows**") and Steven M. Warsh (the "**Debtor**").  Based upon my involvement in those dealings and on

my personal involvement in the following matters and upon review of the business records of Velocity, I have personal knowledge of the matters set forth below.

4.     In my capacity as Special Asset Manager for Velocity, I have reviewed and am familiar with the records, documents and files relating to Maui Meadows and the Debtor, including the original loan documents (e.g., note and mortgage) from the records and files maintained by Velocity and kept under my custody and control.  Exhibits "1" - "6" attached to this declaration are true and correct copies of various loan documents, described more specifically below, made from the records and files maintained by Velocity.

5.     The loan documents have been kept in the ordinary course of business conducted by Velocity on behalf of U.S. Bank, and were made at or near the time of the acts or events evidenced by such documents.  I have reviewed the loan documents in conjunction with the preparation of this Declaration.

6.     U.S. Bank is a National Bank doing business in the State of Hawai'i, and U.S. Bank is acting solely in its capacity as said Trustee for Velocity Commercial Capital Loan Trust 2018-2.  Velocity is the lender of the loan, and services the loan on behalf of U.S. Bank.

7.     On or about March 27, 2018, for and in consideration of a loan made by Velocity to Maui Meadows in the principal sum of ONE MILLION, FIFTY THOUSAND DOLLARS AND NO/100 DOLLARS ($1,050,000.00), Maui

Meadows made, executed and delivered to Velocity a Semi-Annual Adjustable Term Note ("**Note**"). A true and correct copy of the Note is attached hereto as Exhibit "1" and made a part hereof.

        8.    At the same time as the execution of the Note, and as part of the same transaction, and in order to secure the payment of the principal, interest, and other amounts owed under the Note, Maui Meadows made, executed, and delivered to U.S. Bank's predecessor-in-interest, as the Lender, a Mortgage dated March 27, 2018 ("**Mortgage**"), which Mortgage was recorded in the Bureau of Conveyances of the State of Hawai'i as Document No. A-66670104. A true and correct copy of the Mortgage is attached hereto as Exhibit "2" and made a part hereof.

        9.    The Mortgage covers that certain parcel of land situated at 3343 Keha Drive, Kihei, Maui, Hawai'i 96753, being Lot 234, area 0.538 acres, more or less, as delineated on the map entitled "MAUI MEADOWS SUBDIVISION, UNIT III", which said map was filed in the Bureau of Conveyances of the State of Hawai'i as File Plan No. 1236, and being designated as Tax Map Key No. 2-2-1-019-003 ("**Property**").

        10.    The Debtor, in his individual capacity, executed and delivered to U.S. Bank's predecessor-in-interest an Unlimited Guaranty dated March 27, 2018 ("**Guaranty**"), of which U.S. Bank is now the holder. Under the Guaranty,

the Debtor absolutely, unconditionally, and irrevocably guaranteed the full and punctual payment of all sums due and owing under the Note. A true and correct copy of the Guaranty is attached hereto as Exhibit "3" and made a part hereof.

11.    On or about August 27, 2019, Velocity executed an Allonge to $1,050,000.00 Promissory Note dated March 27, 2018 ("**Allonge**") and an Assignment of Collateral Agreements and Other Loan Documents ("**Collateral Assignment**"), transferring all right, title, and interest of Velocity in and to the Note and associated loan documents, including the Guaranty, to U.S. Bank National Association, as Trustee for Velocity Commercial Capital Loan Trust 2018-2. A true and correct copy of the Allonge is attached hereto as Exhibit "4" and made a part hereof. A true and correct copy of the Collateral Assignment is attached hereto as Exhibit "5" and made a part hereof.

12.    Velocity subsequently endorsed the Note to U.S. Bank, and U.S. Bank is the owner of and holder of the Note, of which its counsel has in its physical possession.

13.    Velocity executed an Assignment of Commercial Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing to U.S. Bank on October 30, 2020 ("**Assignment**"). Said Assignment was recorded with the State of Hawai'i Bureau of Conveyances on November 2, 2020 as Document

No. A76110379.  A true and correct copy of the Assignment is attached hereto as

Exhibit "6" and made a part hereof.

14.    Under the terms of the Note, Maui Meadows promised to repay

to U.S. Bank, or order, any and all monies due and owing under the Note, plus

interest and allowable charges.

15.    Maui Meadows is in default under the Note and Mortgage for

failure to make payments under the Note and Mortgage.  The loan has been in

default for nonpayment since May 1, 2020.

16.    Pursuant to the terms of the Note and Mortgage, U.S. Bank has

exercised its option to declare the entire balance of the Note, together with interest,

to be immediately due and payable.  As of April 7, 2021, there is due and owing

the principal sum of ONE MILLION THIRTY-THREE THOUSAND THREE

HUNDRED NINETY AND 72/100 ($1,033,390.72), together with interest accrued

in the amount of NINETY-FIVE THOUSAND FORTY-FIVE AND 99/100

($95,045.99), together with default interest accrued in the amount of ONE

HUNDRED THREE THOUSAND SEVEN HUNDRED FORTY-SEVEN AND

99/100 ($103,747.90).  The total amount due under the Note is ONE MILLION

TWO HUNDRED FIFTY-NINE THOUSAND SEVEN HUNDRED SEVENTY

AND 54/100 DOLLARS ($1,259,770.54).

17.     Thereafter, interest is payable, due and unpaid on the principal sum at the rate of 8.490 % per annum.

18.     Default interest continues to accrue on the Note at the rate of 4.0% per annum, from and including May 1, 2020.

19.     Although demand has been made for payment of the indebtedness due to U.S. Bank under the terms of the Note and Mortgage, said amounts have not been paid by Maui Meadows.

20.     At loan origination, Maui Meadows signed a Business Purpose of Loan Certification, certifying that the loan was made exclusively for a business purpose.  A true and correct copy of the Business Purpose of Loan Certification is attached hereto as Exhibit "7" and made a part hereof.

21.     Also at loan origination, the Debtor signed a Certification of Occupancy Disclosure declaring, under penalty of perjury, that he did not ever intend to occupy the Property, that the Loan was to acquire, improve, or maintain rental property, and that the Loan proceeds would not be used for personal, family, or household purposes.  A true and correct copy of the Certification of Occupancy Disclosure is attached hereto as Exhibit "8" and made a part hereof.

22.     When Maui Meadows filled out its original Loan Application, it listed the Property as a rental being held for income.  A true and correct copy of the Loan Application is attached hereto as Exhibit "9" and made a part hereof.

23.     After the foreclosure proceedings were initiated, the Debtor attempted to submit a loan modification application to Velocity through Velocity's servicer, Mr. Cooper. As part of that loan modification request, the Debtor included copies of multiple rental agreement on the Property. However, Velocity does not offer loan modifications or other loss mitigation options for commercial loans. A true and correct copy of the Leases received by Velocity is attached hereto as Exhibit "10" and made a part hereof.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27th day of October, 2021, in Westlake Village, California.

GLORIA-JANE MEYER



velocity
commercial capital

### SEMI-ANNUAL ADJUSTABLE TERM NOTE

**March 27, 2018**

**$1,050,000.00**

For value received, the undersigned MAUI MEADOWS MANAGEMENT LLC, a Hawaii limited liability company (the "Borrower"), promises to pay to the order of Velocity Commercial Capital, LLC (together with its successors and assigns, the "Lender"), the principal amount of **One Million, Fifty Thousand Dollars and Zero Cents ($1,050,000.00)** on or before **April 1, 2048** (the "Maturity Date"), as set forth below, together with interest from the date hereof on the unpaid principal balance from time to time outstanding until paid in full. The Borrower shall pay consecutive monthly installments of principal and interest, as follows: **$8,066.15** commencing on **May 1, 2018**, and the same amount (except the last installment which shall be the unpaid balance) on the 1st day of each month thereafter. The aggregate principal balance outstanding shall initially bear interest thereon at a fixed rate equal to **Eight and Forty-Nine Hundredths Percent** (8.490%) per annum. The interest rate on the aggregate principal balance shall change on **April 1, 2021** (the "Special Change Date") to a fixed rate equal to **Five Percent (5.000%)** above the Wall Street Journal Prime Rate (as hereinafter defined) as of 30 days prior to such Special Change Date, except that in no case shall the interest rate on the Special Change Date be greater than Two Percent (2%) above the initial rate. The interest rate on the aggregate principal balance shall change again on **October 1, 2021** and on the 1st day of each month every sixth month thereafter (each a "Change Date") to a fixed rate equal to **Five Percent (5.000%)** above the Wall Street Journal Prime Rate as of 30 days prior to such Change Date. On the Special Change Date and each Change Date each monthly installment due and payable until the next Change Date shall be recalculated (increased or reduced) to reflect the adjusted interest rate, the outstanding principal balance at such time and the remaining term of the **360** month amortization period commencing on the date of this Note in accordance with the Lender's calculation in the Lender's sole discretion.

The calculation of the payment amount is based on a **360** month amortization period.

Notwithstanding anything to the contrary in this Note, the interest rate on this Note is limited by a floor and a ceiling as follows: (i) the maximum interest rate (i.e. ceiling) is **14.490%** per annum and (ii) the minimum interest rate (i.e. floor) is **8.490%** per annum. In addition, on each Change Date the interest rate on this Note shall be changed (increased or reduced) by no more than **1.000%** per annum.

Wall Street Journal Prime Rate means the rate published from time to time by the Wall Street Journal as the Prime Rate on corporate loans posted by at least 70% of the 10 largest U.S. banks, or, in the event the Wall Street Journal ceases publication of the Prime Rate, the base, reference or other rate then designated by the Lender, in its sole discretion, for general commercial loan reference purposes, it being understood that such rate is a reference rate, not necessarily the lowest, established from time to time, which serves as the basis upon which effective interest rates are calculated for loans making reference thereto.

The effective interest rate applicable to the Borrower's loans evidenced hereby shall be rounded to the nearest One-Eighth Percent (0.125%).

Principal and interest shall be payable at the Lender's main office or at such other place as the Lender may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated monthly on the basis of a 360-day year based on twelve (12) thirty (30) day months except that interest due and payable for a period of less than a full month shall be calculated by multiplying the actual number of days elapsed in such period by a daily rate based on said 360-day year.

This Note may be prepaid in whole or in part upon thirty (30) days prior written notice to the Lender. In the event of any prepayment of this Note at any time through April 1, 2021 (the "Prepayment Charge Expiration Date") whether by voluntary prepayment, acceleration or otherwise, the Borrower shall, at the option of the Lender, pay a "Prepayment Premium" equal to **3%** of the principal amount so prepaid. No Prepayment Premium will be due Lender if (a) prior to the Prepayment Charge Expiration Date, a prepayment amount received plus all other prepayment amounts received in the most recent 12 months is not greater than 20% of the Principal Amount of the Note or (b) a prepayment is made in whole or in part after the Prepayment Charge Expiration Date. For all purposes including the accrual of interest, any prepayment received by Lender on any day other than the last calendar day of the month shall be deemed to have been received on the last calendar day of the month.

At the option of the Lender, this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of any of the following events of default (each, an "Event of Default"): (1) default of any liability, obligation, covenant or undertaking of the Borrower, any endorser or any guarantor hereof to the Lender, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Borrower, any endorser or any guarantor hereof under any other loan document delivered by the Borrower, any endorser or any guarantor, or in connection with the loan evidenced by this Note or any other agreement by the Borrower, any endorser or any guarantor with the Lender; (2) failure of the Borrower, any endorser or any guarantor hereof to maintain aggregate collateral security value satisfactory to the Lender; (3) default of any material liability, obligation or undertaking of the Borrower, any endorser or any guarantor hereof to any other party; (4) if any statement, representation or warranty heretofore, now or hereafter made by the Borrower, any endorser or any guarantor hereof in connection with the loan evidenced by this Note or in any supporting financial statement of the Borrower, any endorser or any guarantor hereof shall be determined by the Lender to have been false or misleading in any material respect when made; (5) if the Borrower, any endorser or any guarantor hereof is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property; (6) the death of the Borrower, any endorser or any guarantor hereof and, if the Borrower, any endorser or any guarantor hereof is a partnership or limited liability company, the death of any partner or member; (7) the institution by or against the Borrower, any endorser or any guarantor hereof of any proceedings under the Bankruptcy Code 11 USC §101 *et seq.* or any other law in which the Borrower, any endorser or any guarantor hereof is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Borrower, any endorser or any guarantor hereof of an assignment for the benefit of creditors or the granting by the Borrower, any endorser or any guarantor hereof of a trust mortgage for the benefit of creditors; (8) the service upon the Lender of a writ in which the Lender is named as trustee of the Borrower, any endorser or any guarantor hereof; (9) a judgment or judgments for the payment of money shall be rendered against the Borrower, any endorser or any guarantor hereof, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; (10) any levy, lien (including mechanics lien) except as permitted under any of the other loan documents between the Lender and the Borrower, seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower, any endorser or any guarantor hereof; (11) the termination or revocation of any guaranty hereof; or (12) the occurrence of such a change in the condition or affairs (financial or otherwise) of the Borrower, any endorser or any guarantor hereof, or the occurrence of any other event or circumstance, such that the Lender, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Borrower, any endorser or any guarantor hereof to the Lender has been or may be impaired.

Any payments received by the Lender on account of this Note shall, at the Lender's option, be applied first, to any costs, expenses or charges then owed to the Lender by the Borrower; second, to accrued and unpaid interest; third, to the unpaid principal balance hereof; and the balance to escrows, if any. Notwithstanding the foregoing, any payments received after the occurrence and during the continuance of an Event of Default shall be applied in such manner as the Lender may determine. The Borrower hereby authorizes the Lender to charge any deposit account which the Borrower may maintain with the Lender for any payment required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Lender that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.**

The Borrower and each endorser and guarantor hereof grant to the Lender a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Lender to the Borrower and/or each endorser or guarantor hereof and any cash, securities, instruments or other property of the Borrower and each endorser and guarantor hereof in the possession of the Lender, whether for safekeeping or otherwise, or in transit to or from the Lender (regardless of the reason the Lender had received the same or whether the Lender has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower and/or any endorser or guarantor hereof to the Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower or any endorser or guarantor hereof to the Lender at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Lender.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and every endorser or guarantor of this Note, regardless of the time, order or place of signing, waive presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral. To the maximum extent permitted by law, the Borrower and each endorser and guarantor of this Note waive and terminate any homestead rights and/or exemptions respecting any premises under the provisions of any applicable homestead laws.

The Borrower and each endorser and guarantor of this Note shall indemnify, defend and hold the Lender and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless against any claim brought or threatened against any Indemnitee by the Borrower, by any endorser or guarantor, or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Borrower or any endorser or guarantor hereof (each of which may be defended, compromised, settled or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Borrower and any endorser and/or guarantor), except for any claim arising out of the gross negligence or willful misconduct of the Lender.

The Borrower and each endorser and guarantor of this Note agree to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 4.0% plus the rate provided for herein. If any payment due under this Note, or under any other agreement executed and delivered in connection with this Note, including, without limitation, any amounts required to be paid into escrow accounts in connection with any mortgage securing this Note is unpaid for 10 days or more, the Borrower shall pay, in addition to any other sums

3

due under this Note (and without limiting the Lender's other remedies on account thereof), a late charge equal to 5.0% of such unpaid amount, including, without limitation, any amounts required to be paid into escrow accounts in connection with any mortgage securing this Note.

This Note shall be binding upon the Borrower and each endorser and guarantor hereof and upon their respective heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Lender and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any endorser or guarantor of this Note are joint and several; provided, however, the release by the Lender of the Borrower or any one or more endorsers or guarantors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any endorser or guarantor of this Note are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Lender. Each reference in this Note to the Borrower and each Borrower, if more than one, and endorser or guarantor of this Note, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Lender of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Lender of any collateral shall not release any person obligated on account of this Note.

The Borrower and each endorser and guarantor hereof each authorizes the Lender to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Lender, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

The Borrower will from time to time execute and deliver to the Lender such documents, and take or cause to be taken, all such other further action, as the Lender may request in order to effect and confirm or vest more securely in the Lender all rights contemplated by this Note or any other loan documents related thereto (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Lender the security interest in any collateral securing this Note or to comply with applicable statute or law.

This Note shall be governed by the laws of the State of Hawaii.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Lender, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Lender at the address set forth in this Note or as any party may from time to time designate by written notice to the other party.

The Borrower and each endorser and guarantor of this Note each irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Hawaii, over any suit, action or proceeding arising out of or relating to this Note. Each of the Borrower and each endorser and guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Each of the Borrower and each endorser and guarantor hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, endorser's or guarantor's address shown below or as notified to the Lender and (ii) by serving the same upon the Borrower(s), endorser(s) or guarantor(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower or such endorser or guarantor.

**THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN**

ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER, EACH ENDORSER AND GUARANTOR TO THE LENDER, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE LENDER EACH CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

Executed as an instrument under seal as of **March 27, 2018**.

Borrower:

MAUI MEADOWS MANAGEMENT LLC

By: _____
Steven M. Warsh, Manager

616 Laniolu St
Kihei, Hawaii 96753

5

© 2018 Medici, a division of Wolters Kluwer Financial Services

4193


RECEIVED
JAN 1 4 2019



STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED
April 03, 2018 8:01 AM
Doc No(s) A-66670104

/s/ LESLIE T. KOBATA
REGISTRAR



1    1/1    KEO
B-33143870

| LAND COURT SYSTEM | REGULAR SYSTEM |
|---|---|

Return by Mail ☐    Pickup ☐    To:

Velocity Commercial Capital, LLC

PO BOX 7089

Westlake Village, CA 91359-7089

Attention:    Post-Closing Department

Telephone:

041700936
FNTIC
(RK)

**TITLE OF DOCUMENT:**

COMMERCIAL MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

**PARTIES TO DOCUMENT:**

**MORTGAGOR:**    MAUI MEADOWS MANAGEMENT LLC

**MORTGAGEE:**    Velocity Commercial Capital, LLC, a California Limited Liability Company

**TAX MAP KEY(S):**    2-2-1-019-003-0000    This document consists of 18 pages

EXHIBIT "2"

**COMMERCIAL MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING**

This COMMERCIAL MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this "Mortgage") is entered into as of **March 27, 2018**, between **MAUI MEADOWS MANAGEMENT LLC, a Hawaii** limited liability company, with an address of **616 Laniolu St, Kihei, Hawaii 96753** (the "Mortgagor") and Velocity Commercial Capital, LLC, a California Limited Liability Company, with an address of 30699 Russell Ranch Rd., Suite 295, Westlake Village, CA 91362 (the "Lender").

The real property which is the subject matter of this Mortgage has the following address(es): **3343 Keha Drive**, **Kihei, Hawaii 96753** (the "Address(es)").

## 1.    MORTGAGE, OBLIGATIONS AND FUTURE ADVANCES

1.1    <u>Mortgage</u>.  For valuable consideration paid and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor hereby irrevocably and unconditionally mortgages, grants, bargains, transfers, sells, conveys, sets over and assigns to the Lender and its successors and assigns forever, the "Property" described below, to secure the prompt payment and performance of the Obligations (as hereinafter defined), including without limitation, all amounts due and owing to the Lender and all obligations respecting  that certain **Semi-Annual Adjustable Term Note**, dated **March 27, 2018**, by **MAUI MEADOWS MANAGEMENT LLC** in favor of the Lender in the original principal amount of **$1,050,000.00** (the "Note"; and collectively, along with all other agreements, documents, certificates and instruments delivered in connection therewith, the "Loan Documents"), and any substitutions, modifications, extensions or amendments to any of the Loan Documents.

This Mortgage shall secure payment and performance of all Obligations up to and including the principal amount of $1,050,000.00 (the "Maximum Principal Amount"), all accrued interest thereon ("Accrued Interest") and all amounts (other than principal) payable by Mortgagor under the Loan Documents, including, without limitation, all taxes and insurance premiums paid or advanced by Lender with respect to the Property, all costs of enforcing and foreclosing on the lien of this Mortgage, and all sums expended or incurred for the protection of the security interest hereby created in the Property, regardless of whether the foregoing was advanced, paid, incurred now or at any future time or times ("Protective Advances").  The Obligations secured include, without limitation, any liabilities and future advances, direct or indirect, absolute or contingent, now existing or hereafter arising, owed by Mortgagor to the Lender.

1.2    <u>Security Interest in Property</u>.  As continuing security for the Obligations the Mortgagor hereby pledges, assigns and grants to the Lender, and its successors and assigns, a security interest in any of the Property (as hereinafter defined) constituting personal property or fixtures.  This Mortgage is and shall be deemed to be a security agreement and financing statement pursuant to the terms of the Uniform Commercial Code of Hawaii (the "Uniform Commercial Code") as to any and all personal property and fixtures and as to all such property the Lender shall have the rights and remedies of a secured party

2

under the Uniform Commercial Code in addition to its rights hereunder. This Mortgage constitutes a financing statement filed as a fixture filing under Section 490:9-502(c) of the Uniform Commercial Code covering any Property which now is or later may become a fixture.

1.3    Collateral Assignment of Leases and Rents.    The Mortgagor hereby irrevocably and unconditionally assigns to the Lender, and its successors and assigns, as collateral security for the Obligations all of the Mortgagor's rights and benefits under any and all Leases (as hereinafter defined) and any and all rents and other amounts now or hereafter owing with respect to the Leases or the use or occupancy of the Property. This collateral assignment shall be absolute and effective immediately, but the Mortgagor shall have a license, revocable by the Lender, to continue to collect rents owing under the Leases until an Event of Default (as hereinafter defined) occurs and the Lender exercises its rights and remedies to collect such rents as set forth herein.

1.4    Conditions to Grant.    The Lender shall have and hold the above granted Property unto and to the use and benefit of the Lender, and its successors and assigns, forever; provided, however, the conveyances, grants and assignments contained in this Mortgage are upon the express condition that, if Mortgagor shall irrevocably pay and perform the Obligations in full, including, without limitation, all principal, interest and premium thereon and other charges, if applicable, in accordance with the terms and conditions in the Loan Documents (as hereinafter defined) and this Mortgage, shall pay and perform all other Obligations as set forth in this Mortgage and shall abide by and comply with each and every covenant and condition set forth herein and in the Loan Documents, the conveyances, grants and assignments contained in this Mortgage shall be appropriately released and discharged.

1.5    Property.    The term "Property," as used in this Mortgage, shall mean that certain parcel of land and the fixtures, structures and improvements and all personal property constituting fixtures, as that term is defined in the Uniform Commercial Code, now or hereafter thereon located at the Address(es), as more particularly described in Exhibit A attached hereto, together with: (i) all rights now or hereafter existing, belonging, pertaining or appurtenant thereto; (ii) the following categories of assets as defined in the Uniform Commercial Code: goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of any thereof, whether now owned or hereafter acquired, that are located on or used in connection with, or that arise in whole or in part out of the Mortgagor's use of or business conducted on or respecting, the Property and any substitutions, replacements, accessions and proceeds of any of the foregoing; (iii) all judgments, awards of damages and settlements hereafter made as a result or in lieu of any Taking, as hereinafter defined; (iv) all of the rights and benefits of the Mortgagor under any present or future leases and agreements relating to the Property, including, without limitation, rents, issues and profits, or the use or occupancy thereof together with any extensions and renewals thereof, specifically excluding all duties or obligations of the Mortgagor of any kind arising thereunder (the "Leases"); and (v) all contracts, permits and licenses respecting the use, operation or maintenance of the Property.

1.6    Obligations.    The term "Obligation(s)," as used in this Mortgage, shall mean without limitation all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, now or hereafter owing by the Mortgagor to the Lender at any time, of each and every kind, nature and description, whether arising under this Mortgage or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by the Mortgagor to the Lender; or are due indirectly by the Mortgagor to the Lender as endorser, guarantor or other surety, or as obligor of obligations due third persons which have been endorsed or assigned to the Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter contracted, including, without limitation, payment of all

2

amounts outstanding when due pursuant to the terms of any of the Loan Documents. Said term shall also include all interest and other charges chargeable to the Mortgagor or due from the Mortgagor to the Lender from time to time and all advances, costs and expenses referred to in this Mortgage, including without limitation the costs and expenses (including reasonable attorney's fees) of enforcement of the Lender's rights hereunder or pursuant to any document or instrument executed in connection herewith.

1.7     Cross-Collateral and Future Advances.   It is the express intention of the Mortgagor that this Mortgage secure payment and performance of all of the Obligations, whether now existing or hereinafter incurred by reason of future advances by the Lender or otherwise, and regardless of whether such Obligations are or were contemplated by the parties at the time of the granting of this Mortgage. Notice of the continuing grant of this Mortgage shall not be required to be stated on the face of any document evidencing any of the Obligations, nor shall such documents be required to otherwise specify that they are secured hereby.

1.8     Future Advances and Maximum Principal Amount Secured.   This Mortgage secures all future advances and obligations which are Obligations up to the Maximum Principal Amount. The total amount of obligations and advances secured hereby may decrease or increase from time to time provided the amount of the lien shall not exceed the Maximum Principal Amount, Accrued Interest and Protective Advances at any one time.

## 2.     REPRESENTATIONS, WARRANTIES, COVENANTS

2.1     Representations and Warranties.  The Mortgagor represents and warrants that:

    (a)     This Mortgage has been duly executed and delivered by the Mortgagor and is the legal, valid and binding obligation of the Mortgagor enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally;

    (b)     The Mortgagor is the sole legal owner of the Property, holding good and marketable fee simple title to the Property, subject to no liens, encumbrances, leases, security interests or rights of others, other than as set forth in detail in Exhibit B hereto (the "Permitted Encumbrances");

    (c)     The Mortgagor is the sole legal owner of the entire lessor's interest in Leases, if any, with full power and authority to encumber the Property in the manner set forth herein, and the Mortgagor has not executed any other assignment of Leases or any of the rights or rents arising thereunder;

    (d)     As of the date hereof, there are no Hazardous Substances (as hereinafter defined) in, on or under the Property, except as disclosed in writing to and acknowledged by the Lender; and

    (e)     Each Obligation is a commercial obligation and does not represent a loan used for personal, family or household purposes and is not a consumer transaction.

2.2     Recording; Further Assurances.  The Mortgagor covenants that it shall, at its sole cost and expense and upon the request of the Lender, cause this Mortgage, and each amendment, modification or supplement hereto, to be recorded and filed in such manner and in such places, and shall at all times comply with all such statutes and regulations as may be required by law in order to establish, preserve and protect the interest of the Lender in the Property and the rights of the Lender under this Mortgage. Mortgagor will from time to time execute and deliver to the Lender such documents, and take or cause to

be taken, all such other or further action, as the Lender may request in order to effect and confirm or vest more securely in the Lender all rights contemplated by this Mortgage (including, without limitation, to correct clerical errors) or to vest more fully in, or assure to the Lender the security interest in, the Property or to comply with applicable statute or law.  To the extent permitted by applicable law, Mortgagor authorizes the Lender to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be filed at any time in any jurisdiction. The Lender may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Property as defined in this Mortgage and which contain any other information required by Article 9 of the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Mortgagor is an organization, the type of organization and any organization identification number issued to Mortgagor; Mortgagor also authorizes the Lender to file financing statements describing any agricultural liens or other statutory liens held by the Lender.  Mortgagor agrees to furnish any such information to the Lender promptly upon request.  In addition, Mortgagor shall at any time and from time to time, take such steps as the Lender may reasonably request for the Lender (i) to obtain an acknowledgment, in form and substance satisfactory to the Lender, of any bailee having possession of any of the Property that the bailee holds such Property for the Lender, and (ii) otherwise to insure the continued perfection and priority of the Lender's security interest in any of the Property and the preservation of its rights therein.  Mortgagor hereby constitutes the Lender its attorney-in-fact to execute and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Mortgage terminates in accordance with its terms, all Obligations are paid in full and the Property is released.

2.3     Restrictions on the Mortgagor.  The Mortgagor covenants that it will not, nor will it permit any other person to, directly or indirectly, without the prior written approval of the Lender in each instance:

(a)     Sell, convey, assign, transfer, mortgage, pledge, hypothecate, lease or dispose of all or any part of any legal or beneficial interest in the Mortgagor or the Property or any part thereof or permit any of the foregoing, except as expressly permitted by the terms of this Mortgage;

(b)     Permit the use, generation, treatment, storage, release or disposition of any oil or other material or substance constituting hazardous waste or hazardous materials or substances under any applicable Federal or state law, regulation or rule ("Hazardous Substances"); or

(c)     Permit to be created or suffer to exist any mortgage, lien, security interest, attachment or other encumbrance or charge on the Property or any part thereof or interest therein (except for the Permitted Encumbrances), including, without limitation, (i) any lien arising under any Federal, state or local statute, rule, regulation or law pertaining to the release or cleanup of Hazardous Substances and (ii) any mechanics' or materialmen's lien.  The Mortgagor further agrees to give the Lender prompt written notice of the imposition, or notice, of any lien referred to in this Section and to take any action necessary to secure the prompt discharge or release of the same.  The Mortgagor agrees to defend its title to the Property and the Lender's interest therein against the claims of all persons and, unless the Lender requests otherwise, to appear in and diligently contest, at the Mortgagor's sole cost and expense, any action or proceeding that purports to affect the Mortgagor's title to the Property or the priority or validity of this Mortgage or the Lender's interest hereunder.

2.4     Operation of Property.  The Mortgagor covenants and agrees as follows:

(a)     The Mortgagor will not permit the Property to be used for any unlawful or improper purpose, will at all times comply with all Federal, state and local laws, ordinances and regulations, and

the provisions of any Lease, easement or other agreement affecting all or any part of the Property, and will obtain and maintain all governmental or other approvals relating to the Mortgagor, the Property or the use thereof, including without limitation, any applicable zoning or building codes or regulations and any laws or regulations relating to the handling, storage, release or cleanup of Hazardous Substances, and will give prompt written notice to the Lender of (i) any violation of any such law, ordinance or regulation by the Mortgagor or relating to the Property, (ii) receipt of notice from any Federal, state or local authority alleging any such violation and (iii) the presence or release on the Property of any Hazardous Substances;

(b)     The Mortgagor will at all times keep the Property insured for such losses or damage, in such amounts and by such companies as may be required by law and which the Lender may require, provided that, in any case, the Mortgagor shall maintain: (i) physical hazard insurance on an "all risks" basis in an amount not less than 100% of the full replacement cost of the Property; (ii) flood insurance if and as required by applicable Federal law and as otherwise required by the Lender; (iii) comprehensive commercial general liability insurance; (iv) rent loss and business interruption insurance; and (v) such other insurance as the Lender may require from time to time, including builder's risk insurance in the case of construction loans. All policies regarding such insurance shall be issued by companies licensed to do business in the state where the policy is issued and also in the state where the Property is located, be otherwise acceptable to the Lender, provide deductible amounts acceptable to the Lender, name the Lender as mortgagee, loss payee and additional insured, and provide that no cancellation or material modification of such policies shall occur without at least Thirty (30) days prior written notice to the Lender.   Such policies shall include (i) a mortgage endorsement determined by the Lender in good faith to be equivalent to the "standard" mortgage endorsement so that the insurance, as to the interest of the Lender, shall not be invalidated by any act or neglect of the Mortgagor or the owner of the Property, any foreclosure or other proceedings or notice of sale relating to the Property, any change in the title to or ownership of the Property, or the occupation or use of the Property for purposes more hazardous than are permitted at the date of inception of such insurance policies; (ii) a replacement cost endorsement; (iii) an agreed amount endorsement; (iv) a contingent liability from operation endorsement; and (v) such other endorsements as the Lender may request. The Mortgagor will furnish to the Lender upon request such original policies, certificates of insurance or other evidence of the foregoing as are acceptable to the Lender.  The terms of all insurance policies shall be such that no coinsurance provisions apply, or if a policy does contain a coinsurance provision, the Mortgagor shall insure the Property in an amount sufficient to prevent the application of the coinsurance provisions;

(c)     Mortgagor will not enter into or modify the Leases in any material respect without the prior written consent of the Lender, execute any assignment of the Leases except in favor of the Lender, or accept any rentals under any Lease for more than one month in advance and will at all times perform and fulfill every term and condition of the Leases;

(d)     Mortgagor will at all times (i) maintain complete and accurate records and books regarding the Property in accordance with generally accepted accounting principles and (ii) permit the Lender and the Lender's agents, employees and representatives, at such reasonable times as the Lender may request, to enter and inspect the Property and such books and records; and

(e)     Mortgagor will at all times keep the Property in good and first-rate repair and condition (damage from casualty not excepted) and will not commit or permit any strip, waste, impairment, deterioration or alteration of the Property or any part thereof.

(f)     Mortgagor shall not enter into or modify the Lease or subleases with any lessor that engages in any use or occupancy of the property that would be a violation of any state and/or federal laws involving controlled substances, even in a jurisdiction that allows such use by state or local law or ordinance. Every Lease or sublease of the property shall expressly prohibit tenants or other occupants from engaging or permitting others to engage in such use or occupancy. In the event that Mortgagor becomes aware of such a violation, Mortgagor shall take all actions allowed by law to terminate the activity, including lease termination. Violation of this paragraph is a material breach of this agreement and constitutes an Event of Default.

2.5     Payments. The Mortgagor covenants to pay when due: all Federal, state, municipal, real property and other taxes, betterment and improvement assessments and other governmental levies, water rates, sewer charges, insurance premiums and other charges on the Property, this Mortgage or any Obligation secured hereby that could, if unpaid, result in a lien on the Property or on any interest therein. If and when requested by the Lender, the Mortgagor shall deposit from time to time with the Lender sums determined by the Lender to be sufficient to pay when due the amounts referred to in this Section. The Mortgagor shall have the right to contest any notice, lien, encumbrance, claim, tax, charge, betterment assessment or premium filed or asserted against or relating to the Property; provided that it contests the same diligently and in good faith and by proper proceedings and, at the Lender's request, provides the Lender with adequate cash security, in the Lender's reasonable judgment, against the enforcement thereof. The Mortgagor shall furnish to the Lender the receipted real estate tax bills or other evidence of payment of real estate taxes for the Property within thirty (30) days prior to the date from which interest or penalty would accrue for nonpayment thereof. The Mortgagor shall also furnish to the Lender evidence of all other payments referred to above within fifteen (15) days after written request therefor by the Lender. If Mortgagor shall fail to pay such sums, the Lender may, but shall not be obligated to, advance such sums. Any sums so advanced by the Lender shall be added to the Obligations, shall bear interest at the highest rate specified in any note evidencing the Obligations, and shall be secured by the lien of this Mortgage.

2.6     Notices; Notice of Default. The Mortgagor will deliver to the Lender, promptly upon receipt of the same, copies of all notices or other documents it receives that affect the Property or its use, or claim that the Mortgagor is in default in the performance or observance of any of the terms hereof or that the Mortgagor or any tenant is in default of any terms of the Leases. The Mortgagor further agrees to deliver to the Lender written notice promptly upon the occurrence of any Event of Default hereunder or event that with the giving of notice or lapse of time, or both, would constitute an Event of Default hereunder.

2.7     Takings. In case of any condemnation or expropriation for public use of, or any damage by reason of the action of any public or governmental entity or authority to, all or any part of the Property (a "Taking"), or the commencement of any proceedings or negotiations that might result in a Taking, the Mortgagor shall immediately give written notice to the Lender, describing the nature and extent thereof. The Lender may, at its option, appear in any proceeding for a Taking or any negotiations relating to a Taking and the Mortgagor shall immediately give to the Lender copies of all notices, pleadings, determinations and other papers relating thereto. The Mortgagor shall in good faith and with due diligence and by proper proceedings file and prosecute its claims for any award or payment on account of any Taking. The Mortgagor shall not settle any such claim without the Lender's prior written consent. The Mortgagor shall hold any amounts received with respect to such awards or claims, by settlement, judicial decree or otherwise, in trust for the Lender and immediately pay the same to the Lender. The Mortgagor authorizes any award or settlement due in connection with a Taking to be paid directly to the Lender in amounts not exceeding the Obligations. The Lender may apply such amounts to the Obligations in such order as the Lender may determine.

2.8     Insurance Proceeds. The proceeds of any insurance resulting from any loss with respect to the Property shall be paid to the Lender and, at the option of the Lender, be applied to the Obligations in such

order as the Lender may determine; provided, however, that if the Lender shall require repair of the Property, the Lender may release all or any portion of such proceeds to the Mortgagor for such purpose. Any insurance proceeds paid to the Mortgagor shall be held in trust for the Lender and promptly paid to it.

## 3. CERTAIN RIGHTS OF THE LENDER

3.1 <u>Legal Proceedings</u>. The Lender shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding that, in the Lender's reasonable judgment, might affect the Property or any of the rights created or secured by this Mortgage. The Lender shall have such right whether or not there shall have occurred an Event of Default hereunder.

3.2 <u>Appraisals/Assessments</u>. The Lender shall have the right, at the Mortgagor's sole cost and expense, to obtain appraisals, environmental site assessments or other inspections of the portions of the Property that are real estate at such times as the Lender deems necessary or as may be required by applicable law, or its prevailing credit or underwriting policies.

3.3 <u>Financial Statements</u>. The Lender shall have the right, at the Mortgagor's sole cost and expense, to require delivery of financial statements in form and substance acceptable to the Lender from the Mortgagor or any guarantor of any of the Obligations and the Mortgagor hereby agrees to deliver such financial statements and/or cause any such guarantor to so deliver any such financial statement when required by the Lender.

3.4 <u>Leases and Rent Roll</u>. The Mortgagor shall deliver to the Lender (i) during each calendar year and at such other times as the Lender shall request a rent roll for the Property, in form acceptable to the Lender, listing all tenants and occupants and describing all of the Leases; and (ii) at such times as the Lender shall request executed copies of all the Leases.

## 4. DEFAULTS AND REMEDIES

4.1 <u>Events of Default</u>. "Event of Default" shall mean the occurrence of any one or more of the following events:

(a)     default of any liability, obligation, covenant or undertaking of the Mortgagor or any guarantor of the Obligations to the Lender, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Mortgagor or any guarantor of the Obligations under any other Loan Document or any other agreement with the Lender;

(b)     failure by the Mortgagor or any guarantor of the Obligations to perform, observe or comply with any of the covenants, agreements, terms or conditions set forth in this Mortgage or the Loan Documents;

(c)     the (i) occurrence of any material loss, theft, damage or destruction of, or (ii) issuance or making of any levy, seizure, attachment, execution or similar process on a material portion of the Property;

(d)     failure of the Mortgagor or any guarantor of the Obligations to maintain aggregate collateral security value satisfactory to the Lender;

(e)     default of any material liability, obligation or undertaking of the Mortgagor or any guarantor of the Obligations to any other party;

7

(f)     if any statement, representation or warranty heretofore, now or hereafter made by the Mortgagor or any guarantor of the Obligations in connection with this Mortgage or in any supporting financial statement of the Mortgagor or any guarantor of the Obligations shall be determined by the Lender to have been false or misleading in any material respect when made;

(g)     if the Mortgagor or any guarantor of the Obligations is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property;

(h)     the death of the Mortgagor or any guarantor of the Obligations and, if the Mortgagor or any guarantor of the Obligations is a partnership or limited liability company, the death of any partner or member;

(i)     the institution by or against the Mortgagor or any guarantor of the Obligations of any proceedings under the Bankruptcy Code 11 USC §101 *et seq.* or any other law in which the Mortgagor or any guarantor of the Obligations is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Mortgagor or any guarantor of the Obligations of an assignment for the benefit of creditors or the granting by the Mortgagor or any guarantor of the Obligations of a trust mortgage for the benefit of creditors;

(j)     the service upon the Lender of a writ in which the Lender is named as trustee of the Mortgagor or any guarantor of the Obligations;

(k)     a judgment or judgments for the payment of money shall be rendered against the Mortgagor or any guarantor of the Obligations, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

(l)     any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Mortgagor or any guarantor of the Obligations;

(m)     the termination or revocation of any guaranty of the Obligations; or

(n)     the occurrence of such a change in the condition or affairs (financial or otherwise) of the Mortgagor or any guarantor of the Obligations, or the occurrence of any other event or circumstance, such that the Lender, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Mortgagor or any guarantor of the Obligations to the Lender has been or may be impaired.

4.2     Remedies.  On the occurrence of any Event of Default the Lender may, at any time thereafter, at its option and, to the extent permitted by applicable law, without notice, exercise any or all of the following remedies:

(a)     Declare the Obligations due and payable, and the Obligations shall thereupon become immediately due and payable, without presentment, protest, demand or notice of any kind, all of which are hereby expressly waived by the Mortgagor except for Obligations due and payable on demand, which shall be due and payable on demand whether or not an event of default has occurred hereunder;

(b)     Enter, take possession of, manage and operate the Property (including all personal property and all records and documents pertaining thereto) and any part thereof and exclude the Mortgagor therefrom, take all actions it deems necessary or proper to preserve the Property and operate the Property as a mortgagee in possession with all the powers as could be exercised by a receiver or as otherwise provided herein or by applicable law; provided, however, the entry by the Lender upon the Property for any reason shall not cause the Lender to be a mortgagee in possession, except upon the express written declaration of the Lender;

(c)     With or without taking possession, receive and collect all rents, income, issues and profits ("Rents") from the Property (including all real estate and personal property and whether past due or thereafter accruing), including as may arise under the Leases, and the Mortgagor appoints the Lender as its true and lawful attorney with the power for the Lender in its own name and capacity to demand and collect Rents and take any action that the Mortgagor is authorized to take under the Leases.  The Lender shall (after payment of all costs and expenses incurred) apply any Rents received by it to the Obligations in such order as the Lender determines, or in accordance with any applicable statute, and the Mortgagor agrees that exercise of such rights and disposition of such funds shall not be deemed to cure any default or constitute a waiver of any foreclosure once commenced nor preclude the later commencement of foreclosure for breach thereof.  The Lender shall be liable to account only for such Rents actually received by the Lender.  Lessees under the Leases are hereby authorized and directed, following notice from the Lender, to pay all amounts due the Mortgagor under the Leases to the Lender, whereupon such lessees shall be relieved of any and all duty and obligation to the Mortgagor with respect to such payments so made;

(d)     In addition to any other remedies, to sell the Property or any part thereof or interest therein pursuant to exercise of its power of sale or otherwise at public auction on terms and conditions as the Lender may determine, or otherwise foreclose this Mortgage in any manner permitted by law, and upon such sale the Mortgagor shall execute and deliver such instruments as the Lender may request in order to convey and transfer all of the Mortgagor's interest in the Property, and the same shall operate to divest all rights, title and interest of the Mortgagor in and to the Property.  In the event this Mortgage shall include more than one parcel of property or subdivision (each hereinafter called a "portion"), the Lender shall, in its sole and exclusive discretion and to the extent permitted by applicable law, be empowered to foreclose upon any such portion without impairing its right to foreclose subsequently upon any other portion or the entirety of the Property from time to time thereafter.  In addition, the Lender may in its sole and exclusive discretion subordinate this Mortgage to one or more Leases for the sole purpose of preserving any such Lease in the event of a foreclosure;

(e)     Cause one or more environmental assessments to be taken, arrange for the cleanup of any Hazardous Substances or otherwise cure the Mortgagor's failure to comply with any statute, regulation or ordinance relating to the presence or cleanup of Hazardous Substances, and the Mortgagor shall provide the Lender or its agents with access to the Property for such purposes; provided that the exercise of any of such remedies shall not be deemed to have relieved the Mortgagor from any responsibility therefor or given the Lender "control" over the Property or cause the Lender to be considered to be a mortgagee in possession, "owner" or "operator" of the Property for purposes of any applicable law, rule or regulation pertaining to Hazardous Substances; and

(f)     Take such other actions or proceedings as the Lender deems necessary or advisable to protect its interest in the Property and ensure payment and performance of the Obligations, including, without limitation, appointment of a receiver (and the Mortgagor hereby waives any right to object to such appointment) and exercise of any of the Lender's remedies provided

herein or in any other document evidencing, securing or relating to any of the Obligations or available to a secured party under the Uniform Commercial Code or under other applicable law.

In addition, the Lender shall have all other remedies provided by applicable law, including, without limitation, the right to pursue a judicial sale of the Property or any portion thereof by deed, assignment or otherwise.

The Mortgagor agrees and acknowledges that the acceptance by the Lender of any payments from either the Mortgagor or any guarantor after the occurrence of any Event of Default, the exercise by the Lender of any remedy set forth herein or the commencement, discontinuance or abandonment of foreclosure proceedings against the Property shall not waive the Lender subsequent or concurrent right to foreclose or operate as a bar or estoppel to the exercise of any other rights or remedies of the Lender. The Mortgagor agrees and acknowledges that the Lender, by making payments or incurring costs described herein, shall be subrogated to any right of the Mortgagor to seek reimbursement from any third parties, including, without limitation, any predecessor in interest to the Mortgagor's title or other party who may be responsible under any law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances.

4.3     Advances.  If the Mortgagor fails to pay or perform any of its obligations respecting the Property, the Lender may in its sole discretion do so without waiving or releasing Mortgagor from any such obligation.  Any such payments may include, but are not limited to, payments for taxes, assessments and other governmental levies, water rates, insurance premiums, maintenance, repairs or improvements constituting part of the Property.  Any amounts paid by the Lender hereunder shall be, until reimbursed by the Mortgagor, part of the Obligations and secured by this Mortgage, and shall be due and payable to the Lender, on demand, together with interest thereon to the extent permitted by applicable law, at the highest rate permitted under any of the notes evidencing the Obligations.

4.4     Cumulative Rights and Remedies.  All of the foregoing rights, remedies and options (including without limitation the right to enter and take possession of the Property, the right to manage and operate the same, and the right to collect Rents, in each case whether by a receiver or otherwise) are cumulative and in addition to any rights the Lender might otherwise have, whether at law or by agreement, and may be exercised separately or concurrently and none of which shall be exclusive of any other.  The Mortgagor further agrees that the Lender may exercise any or all of its rights or remedies set forth herein without having to pay the Mortgagor any sums for use or occupancy of the Property.

4.5     Mortgagor's Waiver of Certain Rights.  To the extent permitted by applicable law, the Mortgagor hereby waives the benefit of all present and future laws (i) providing for any appraisal before sale of all or any portion of the Property or (ii) in any way extending the time for the enforcement of the collection of the Obligations or creating or extending a period of redemption from any sale made hereunder.

## 5.     MISCELLANEOUS

5.1     Costs and Expenses.  To the extent permitted by applicable law, the Mortgagor shall pay to the Lender, on demand, all reasonable expenses (including attorneys' fees and expenses and reasonable consulting, accounting, appraisal, brokerage and similar professional fees and charges) incurred by the Lender in connection with the Lender's interpretation, recordation of this Mortgage, exercise, preservation or enforcement of any of its rights, remedies and options set forth in this Mortgage and in connection with any litigation, proceeding or dispute whether arising hereunder or otherwise relating to the Obligations, together with interest thereon to the extent permitted by applicable law, until paid in full by the Mortgagor at the highest rate set forth in any of the notes evidencing the Obligations.  Any amounts owed by the

Mortgagor hereunder shall be, until paid, part of the Obligations and secured by this Mortgage, and the Lender shall be entitled, to the extent permitted by law, to receive and retain such amounts in any action for a deficiency against or redemption by the Mortgagor, or any accounting for the proceeds of a foreclosure sale or of insurance proceeds.

5.2     Indemnification Regarding Leases.  The Mortgagor hereby agrees to defend, and does hereby indemnify and hold the Lender and each of its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless from all losses, damages, claims, costs or expenses (including attorneys' fees and expenses) resulting from the assignment of the Leases and from all demands that may be asserted against such Indemnitees arising from any undertakings on the part of the Lender to perform any obligations under the Leases.  It is understood that the assignment of the Leases shall not operate to place responsibility for the control or management of the Property upon the Lender or any Indemnitee or make them liable for performance of any of the obligations of the Mortgagor under Leases, respecting any condition of the Property or any other agreement or arrangement, written or oral, or applicable law.

5.3     Indemnification Regarding Hazardous Substances.  The Mortgagor hereby agrees to defend, and does hereby indemnify and hold harmless each Indemnitee from and against any and all losses, damages, claims, costs or expenses, including, without limitation, litigation costs and attorneys' fees and expenses and fees or expenses of any environmental engineering or cleanup firm incurred by such Indemnitee and arising out of or in connection with the Property or resulting from the application of any current or future law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances on or affecting the Property.  The Mortgagor agrees its obligations hereunder shall be continuous and shall survive termination or discharge of this Mortgage and/or the repayment of all debts to the Lender including repayment of all Obligations.

5.4     Indemnitee's Expenses.  If any Indemnitee is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Mortgage or the Property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use thereof by the Mortgagor or other person or entity, then the Mortgagor shall indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Lender in favor of the Mortgagor.

5.5     Waivers.  The Mortgagor waives notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.  No delay or omission of the Lender in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretion (all of which are hereinafter collectively referred to as "the Lender's rights and remedies") hereunder shall constitute a waiver thereof; and no waiver by the Lender of any default of the Mortgagor hereunder or of any demand shall operate as a waiver of any other default hereunder or of any other demand.  No term or provision hereof shall be waived, altered or modified except with the prior written consent of the Lender, which consent makes explicit reference to this Mortgage.  Except as provided in the preceding sentence, no other agreement or transaction, of whatsoever nature, entered into between the Lender and the Mortgagor at any time (whether before, during or after the effective date or term of this Mortgage) shall be construed as a waiver, modification or limitation of any of the Lender's rights and remedies under this Mortgage (nor shall anything in this Mortgage be construed as a waiver, modification or limitation of any of the Lender's rights and remedies under any such other agreement or transaction) but all the Lender's rights and remedies not only under the provisions of this Mortgage but also under any such other agreement or transaction shall be

cumulative and not alternative or exclusive, and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine.

5.6     Waiver of Homestead.  To the maximum extent permitted under applicable law, the Mortgagor hereby waives and terminates any homestead rights and/or exemptions respecting the Property under the provisions of any applicable homestead laws.

5.7     Joint and Several.  If there is more than one Mortgagor, each of them shall be jointly and severally liable for payment and/or performance of all obligations secured by this Mortgage and the term "Mortgagor" shall include each as well as all of them.

5.8     Severability.  If any provision of this Mortgage or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Mortgage (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

5.9     Complete Agreement.  This Mortgage and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

5.10    Binding Effect of Agreement.  This Mortgage shall run with the land and be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Lender shall be entitled to rely thereon) until all Obligations are fully and indefeasibly paid.  The Lender may transfer and assign this Mortgage and deliver any collateral to the assignee, who shall thereupon have all of the rights of the Lender; and the Lender shall then be relieved and discharged of any responsibility or liability with respect to this Mortgage and such collateral.  Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Mortgage or the other Loan Documents.

5.11    Notices.  Any notices under or pursuant to this Mortgage shall be deemed duly received and effective if delivered in hand to any officer or agent of the Mortgagor or Lender, or if mailed by registered or certified mail, return receipt requested, addressed to the Mortgagor or Lender at the address set forth in this Mortgage or as any party may from time to time designate by written notice to the other party.

5.12    Governing Law.  This Mortgage shall be governed by the laws of the State of Hawaii.

5.13    Reproductions.  This Mortgage and all documents which have been or may be hereinafter furnished by the Mortgagor to the Lender may be reproduced by the Lender by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

5.14    Jurisdiction and Venue.  The Mortgagor irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Hawaii, over any suit, action or proceeding arising out of or relating to this Mortgage.  The Mortgagor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.  The Mortgagor hereby consents to process being served in any such suit, action or

proceeding (i) by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the Mortgagor's address set forth herein or such other address as has been provided in writing to the Lender and (ii) in any other manner permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Mortgagor.

5.15  **JURY WAIVER. THE MORTGAGOR AND THE LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS MORTGAGE, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN WAIVED. THE MORTGAGOR CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

EXECUTED under seal as of the date first above written.

Witness:

Mortgagor:
MAUI MEADOWS MANAGEMENT LLC

_____

By: _____
Steven M. Warsh, Manager

13

STATE OF HAWAII

COUNTY OF _Maui_ , SS.                    _3- 27_ , 20_18_

On this _27_ day of _March_ , 20_18_, before me, the undersigned notary public, personally appeared Steven M. Warsh, as Manager of MAUI MEADOWS MANAGEMENT LLC, a Hawaii Limited Liability Company, to me personally known, who, being by me duly sworn (or affirmed) did say that such person executed the foregoing instrument as the free act and deed of such person, and if applicable in the capacity shown, having been duly authorized to execute such instrument in such capacity, in such capacity.

No. 85-459
PUBLIC
STATE OF HAWAII

_____ , NOTARY PUBLIC

MY COMMISSION EXPIRES: _10·30·2021_

Noreen K. Koki
TYPE OR PRINT NAME

Doc. Date: _3-27-18_      # Pages: _19_
Notary Name: __Noreen K. Koki__
_Second_ Circuit
Doc. Description: _Commercial Mortgage, Security_
_Agreement, Assignment of Leases and Rents and Fixture Filing_

_____
Notary Signature
_3-27-18_
Date

NOREEN K. KOKI
NOTARY
No. 85-459
PUBLIC
STATE OF HAWAII

THIS INSTRUMENT WAS PREPARED BY: VELOCITY COMMERCIAL CAPITAL, LLC
ADDRESS:        PO BOX 7089

                Westlake Village, CA 91359-7089

Attention:      Post-Closing Department

14

**EXHIBIT "A"**

## Property Description

See Legal Description attached hereto and made a part hereof.

16

# EXHIBIT "A"

**Order No.:**    041700936

**For Tax Map ID(s):**    **2-2-1-019-003**

All of that certain parcel of land situate at Makawao, Island and County of Maui, State of Hawaii, described as follows:

Lot 234, area 0.538 acres, more or less, as delineated on the map entitled "MAUI MEADOWS SUBDIVISION, UNIT III", which said map was filed in the Bureau of Conveyances of the State of Hawaii as File Plan No. 1236.

Being all the property conveyed by the following:

Commissioner's Deed

| | |
|---|---|
| Grantor: | Joseph Toma, Esq., as Commissioner of the State of Hawaii, County of Maui |
| Grantee: | Maui Meadows Management, LLC, a Hawaiian Limited Liability Company |
| Dated: | April 13, 2016 |
| Recording Date: | April 18, 2016 |
| Recording No.: | A-59520222 |

**EXHIBIT "B"**

**Permitted Encumbrances**

None



## UNLIMITED GUARANTY

TO:    Velocity Commercial Capital, LLC, a California Limited Liability Company (the "Lender")

RE:    **MAUI MEADOWS MANAGEMENT LLC, a Hawaii limited liability company** (the "Borrower")

To induce the Lender to make or continue to make loans, advances, or grant other financial accommodations to the Borrower, in consideration thereof and for loans, advances or financial accommodations heretofore or hereafter granted by the Lender to or for the account of the Borrower, the undersigned **Steven M. Warsh** (the "Guarantor") absolutely, unconditionally and irrevocably guarantees the full and punctual payment to the Lender of all sums which may be presently due and owing and of all sums which shall in the future become due and owing to the Lender from the Borrower, whether direct or indirect, whether as a borrower, guarantor, surety or otherwise, including, without limitation, interest, attorneys' fees and other amounts accruing after the filing of a petition in bankruptcy by or against Borrower, notwithstanding the discharge of Borrower from such obligations, together with all costs and expenses incurred by the Lender in connection with such obligations, this Unlimited Guaranty (this "Guaranty") and the enforcement thereof, and also guarantees the due performance by the Borrower of all its obligations under all other present and future contracts and agreements with the Lender.  This is a guaranty of payment and not collection.

Guarantor also agrees:

(1)    to indemnify and hold the Lender and its directors, officers, employees, agents and attorneys harmless from and against all claims, obligations, demands and liabilities, by whomsoever asserted, and against all losses in any way suffered, incurred or paid as a result of or in any way arising out of or following or consequential to transactions with the Borrower, except for any claim arising out of the gross negligence or willful misconduct of the Lender;

(2)    that this Guaranty shall not be impaired by any modification, supplement, extension, renewal or amendment of any contract or agreement to which the parties thereto may hereafter agree, nor by any modification, increase, release or other alteration of any of the obligations hereby guaranteed or of any security therefor, nor by any agreements or arrangements whatsoever with the Borrower or anyone else, all of which may be done without notice to or consent by the Guarantor;

(3)    that the liability of the Guarantor hereunder is direct and unconditional and due immediately upon default of the Borrower without demand or notice and without requiring the Lender first to resort to any other right, remedy or security;

(4)    that Guarantor shall have no right of subrogation, reimbursement or indemnity whatsoever until the Lender is indefeasibly paid in full, nor any right of recourse to security for the debts and obligations of the Borrower to the Lender;

(5)    that the liability of the Guarantor is unlimited and shall be joint and several with the liabilities of any other guarantors;

(6)    that if the Borrower or the Guarantor or any other guarantor should at any time become insolvent or make a general assignment, or if a petition in bankruptcy or any insolvency or reorganization proceedings shall be filed or commenced by, against or in respect of the Borrower or the Guarantor, or any other guarantor of the obligations guaranteed hereby, any and all obligations of the Guarantor shall be immediately due and payable without notice;

(7) that the Lender's books and records showing the account between the Lender and the Borrower shall be admissible in any action or proceeding, shall be binding upon the Guarantor for the purpose of establishing the items therein set forth and shall constitute conclusive proof thereof;

(8) that this Guaranty is, as to the Guarantor, a continuing Guaranty that shall remain effective under successive transactions until the obligations guaranteed hereby are irrevocably paid in full;

(9) that the death of Guarantor shall not effect the termination of this Guaranty as to Guarantor providing, that in any event within Sixty (60) days after the death of the Guarantor, Borrower or any surviving guarantor shall provide to the Lender evidence that the estate of the Guarantor confirms its obligations to the Lender under this Guaranty;

(10) that termination, release or limitation of any guaranty of the obligations guaranteed hereby by any other guarantor shall not affect the continuing liability hereunder of the Guarantor;

(11) that nothing shall discharge or satisfy the liability of the Guarantor hereunder except the full indefeasible payment and performance of all of the Borrower's debts and obligations to the Lender with interest and costs of collection;

(12) that this Guaranty shall not be affected by the illegality, invalidity or unenforceability of the obligations guaranteed, by any fraudulent, illegal or improper act by the Borrower, the legal incapacity or any other defense of the Borrower, the Guarantor or any other person obligated to the Lender consequential to transactions with the Borrower nor by the invalidation, by operation of law or otherwise, of all or any part of the obligations guaranteed hereby, including but not limited to any interest accruable on the obligations guaranteed hereby during the pendency of any bankruptcy or receivership proceeding of the Borrower;

(13) that any and all present and future debts and obligations of the Borrower to Guarantor are hereby waived and postponed in favor of and subordinated to the full indefeasible payment and performance of all present and future debts and obligations of the Borrower to the Lender;

(14) that the Guarantor hereby grants to the Lender a continuing lien and security interest in all deposits or other sums at any time credited by or due from the Lender to the Guarantor and any property of the Guarantor at any time in the possession of the Lender whether for safekeeping or otherwise, or in transit to or from the Lender (regardless of the reason the Lender had received the same or whether the Lender has conditionally released the same) as security for the full and punctual payment and performance of all of the obligations guaranteed hereby, and such deposits and other sums may be applied or set off against such obligations at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Lender;

(15) that if at any time payment of all or any part of the obligations guaranteed hereunder is rescinded or otherwise must be restored by the Lender to the Borrower or to the creditors of the Borrower or any representative of the Borrower or representative of the Borrower's creditors as a voidable preference or fraudulent transfer or conveyance upon the insolvency, bankruptcy or reorganization of the Borrower or the Guarantor, or to the creditors of the Guarantor or any representative of the Guarantor or representative of the creditors of Guarantor upon the insolvency, bankruptcy or reorganization of the Guarantor or otherwise, this Guaranty shall continue to be effective or be reinstated, as the case may be, as though such payments had not been made, and shall survive as an obligation of the Guarantor, and shall not be discharged or satisfied by said payment or payments, notwithstanding the return of the original of this Guaranty to the Guarantor or to the Borrower, or any other apparent termination of Guarantor's obligations hereunder;

(16) that any rights and remedies available to the Lender under this Guaranty are cumulative, and not exclusive of any rights and remedies otherwise available to the Lender at law or in equity;

(17) that the Lender's delay or omission in exercising any of the Lender's rights and remedies shall not constitute a waiver of these rights and remedies, nor shall the Lender's waiver of any right or remedy operate as a waiver of any other right or remedy available to the Lender. The Lender's waiver of any right or remedy on any one occasion shall not be considered a waiver of same on any subsequent occasion, nor shall this be considered to be a continuing waiver;

(18) that this Guaranty incorporates all discussions and negotiations between the Lender and the Guarantor concerning the guaranty and indemnification provided by the undersigned hereby, and that no such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof, there are no preconditions to the effectiveness of this Guaranty and that no provision hereof may be altered, amended, waived, canceled or modified, except by a written instrument executed, sealed and acknowledged by the Lender's duly authorized officer; and

(19) that this Guaranty and all documents which have been or may be hereinafter furnished by the Guarantor to the Lender may be reproduced by the Lender by any photographic, photostatic, microfilm, xerographic or similar process, and that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business) .

Guarantor waives: notice of acceptance hereof, presentment and protest of any instrument and notice thereof, notice of default and all other notices to which the Guarantor might otherwise be entitled; and any and all defenses, including without limitation, any and all defenses which the Borrower or any other party may have to the fullest extent permitted by law, any defense to this Guaranty based on impairment of collateral or on suretyship defenses of every type; and any right to exoneration or marshaling. To the maximum extent permitted by law, Guarantor waives and terminates any homestead rights and/or exemptions respecting any premises under the provisions of any applicable homestead law. To the extent that it lawfully may, Guarantor hereby further agrees not to invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Lender's rights under this Guaranty or otherwise respecting the guaranteed obligations, and to the extent that it lawfully may do so, the Guarantor hereby irrevocably waives the benefits of all such laws. Except as otherwise provided by applicable law, the Lender shall have no duty as to the collection or protection of any collateral, if any, securing the guaranteed obligations beyond the safe custody thereof.

Guarantor will from time to time execute and deliver to the Lender, and take or cause to be taken, all such other further action as the Lender may request in order to effect and confirm or vest more securely in the Lender all the rights contemplated in this Guaranty (including, without limitation, to correct clerical errors) or respecting any of the obligations guaranteed hereby or to comply with applicable statute or law.

This Guaranty shall be governed by the laws of the State of Hawaii, shall be binding upon the heirs, executors, administrators, successors and assigns of the Guarantor and shall inure to the benefit of the Lender's successors and assigns.

If any provision of this Guaranty is found to be invalid, illegal or unenforceable, the validity of the remainder of the Guaranty shall not be affected.

Guarantor irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Hawaii, over any suit, action or proceeding arising out of or relating to this Guaranty. Guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Guarantor hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing

a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Guarantor's address shown below or as notified to the Lender and (ii) by serving the same upon the Guarantor in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Guarantor.

GUARANTOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS GUARANTY, THE OBLIGATIONS GUARANTEED HEREBY, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN WAIVED. GUARANTOR CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

Executed as an instrument under seal and dated **March 27, 2018**.

Guarantor:

Steven M. Warsh, individually

Address:    **575 Linekona Place
Wailuku, Hawaii 96793**

4

© 2018 Medici, a division of Wolters Kluwer Financial Services

Allonge to $1,050,000.00 Promissory Note dated March 27, 2018
executed by Maui Meadows Management LLC, as Borrower
in favor of Velocity Commercial Capital, LLC, as Lender

PAY TO THE ORDER OF U.S. Bank National Association, as Trustee for Velocity Commercial Capital Loan Trust 2018-2, WITHOUT RECOURSE

Dated  as of August 27, 2019

**VELOCITY COMMERCIAL CAPITAL, LLC,**
**a California limited liability company**

By: _____
Name: Ryan Wise
Title: Senior Associate

Loan Number: ▮▮▮▮2833

EXHIBIT "4"

## ASSIGNMENT OF COLLATERAL AGREEMENTS
## AND OTHER LOAN DOCUMENTS

The undersigned ("Lender") hereby assigns to U.S. Bank National Association, as Trustee for Velocity Commercial Capital Loan Trust 2018-2 ("Assignee") all right, title and interest of Lender in and to all of the loan documents (the "Loan Documents") executed in connection with the loan (the "Loan") in the original principal amount of One Million Fifty Thousand Dollars and No Cents (US $1,050,000.00), to Maui Meadows Management LLC ("Borrower") as evidenced by a Promissory Note (and any Addenda) and secured by a Commercial Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, each dated as of March 27, 2018.

This assignment is given in connection with, and in consideration of, Assignee's purchase of the Loan made by Lender to Borrower, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged.

IN WITNESS WHEREOF, Lender has caused this assignment to be executed, sealed and delivered as of August 27, 2019.

**LENDER:**
**VELOCITY COMMERCIAL CAPITAL, LLC,**
**a California limited liability company**

By: _____
Name: Ryan Wise
Title: Senior Associate

Loan Number: ███ 2833

EXHIBIT "5"

Recording Requested By:
Velocity Commercial Capital, LLC, A California Limited Liability Company

**Record & Return To:**
**Velocity Commercial Capital, LLC**
**30699 Russell Ranch Rd. Suite 295**
**Westlake Village, CA 91362**
**(818) 532-3700**

Loan #: ████2833
**Deal Name: 2018-2**
**Hawaii, HI**

STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED  November 02, 2020  8:02 AM
Doc No A76110379
CONVEYANCE TAX: $0

/s/ LESLIE T. KOBATA, Registrar
KEO 1

---

**Assignment of Commercial Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing**

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, the undersigned, Velocity Commercial Capital, LLC, a California limited liability company, 30699 Russell Ranch Road, Suite 295, Westlake Village, CA, 91362, herein ("Assignor"), does hereby grant, sell, assign, transfer and convey, without recourse unto U.S. Bank National Association, as Trustee for Velocity Commercial Capital Loan Trust 2018-2, 191 South LaSalle Street, MK-IL-SL7R, Chicago, IL 60603 herein ("Assignee") that certain Commercial Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing

**Recorded in Hawaii, HI and referenced below:**
**Borrower: MAUI MEADOWS MANAGEMENT LLC,  a Hawaii limited liability company**
**Original Lender: Velocity Commercial Capital, LLC**
**Recorded: 04/03/2018    Instrument: A-66670104**
**Original Loan Amount: $1,050,000.00    Dated: 03/27/2018**
Property: 3343 Keha Drive, Kihei, HI 96753

Together with the note(s) and obligations therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said document referenced above.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, forever, subject only to the terms and conditions of the document above-described.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed and delivered, effective **10/30/2020**

Velocity Commercial Capital, LLC, a California limited liability company

By: _____
Name: Michelle Byron
Title: Post-Closing Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document

State of California
County of Los Angeles
On **10/30/2020** _____ before me, Marisa Ann Quesnell, Notary Public, personally appeared Michelle Byron, who proved to me on the basis of satisfactory evidence to be the person(s) whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: Marisa Ann Quesnell
My Comm. Expires: 04/09/2024



MARISA ANN QUESNELL
Notary Public - California
Los Angeles County
Commission # 2326183
My Comm. Expires Apr 9, 2024

EXHIBIT "6"

# BUSINESS PURPOSE OF LOAN CERTIFICATION

Date: **3/27/2018**

Loan Number: ████ **2833**

Borrower(s):   Maui Meadows Management LLC

Lender: **VELOCITY COMMERCIAL CAPITAL, LLC**

Borrower certifies to Lender and its successors and assign:

1.      Borrower has applied for and has obtained or may obtain a loan in the principal amount of 1,050,000.00 (the **"Loan"**). The Loan will be secured by a Deed of Trust/Mortgage on the property commonly known as:

**3343 Keha Drive Kihei HI 96753-9345**

2.      Lender has stressed the importance of knowing the primary purpose of this Loan.  Borrower understands that the legal responsibilities of Lender vary considerably depending upon whether a loan is a consumer loan, which is for personal, household or family purposes, or a business loan, which is for every other purpose.

3.      Borrower has previously represented to Lender, and hereby represents again in this certification to Lender, its successors and assigns, that ALL of the purposes of the Loan, exclusive of commissions and loan expenses incurred to obtain the Loan are for business purposes.

4.      No part of the Loan proceeds are intended to be used for a non-business (i.e., consumer) purpose.

Borrower(s) declare(s) under penalty of perjury that the foregoing is true and correct.

Each borrower on the loan. Anybody signing on the loan.

_____

**Steven M. Warsh, Manager**

_3-27-18_

**Date**

## CERTIFICATION OF OCCUPANCY DISCLOSURE

| | | | |
|---|---|---|---|
| Brokerage: | Tangency Point Inc. | Date: | December 11, 2017 |
| Broker/Agent: | Moshe Soker | Applicant: | Steve Warsh |
| Phone: | (213) 325-1137 | Loan #: | ████2833 |
| Email: | moses@tangencypoint.com | AE: | Eleanor Shamam |

**Borrower certifies to Lender, its agents, employees, successors and assigns the following:**

1.  Steve Warsh _____ ('**Borrower/Guarantor**') has applied to Lender for a loan in the amount of $1,200,000 ('The Loan') secured by the real property owned by Maui Meadows Management LLC at 3343 Keha Dr, Kihei, HI, 96753-9345

2.  It is important for Lender to know whether the Property will be occupied by the Borrower/Guarantor as his or her principal residence.

3.  Borrower/Guarantor certifies and represents to Lender that:
    **Borrower/Guarantor has his or her true and only <u>principal residence</u> located at:**
    575 Linekona Pl, Wailuku, HI 96793 _____ .

### MARK ONLY ONE ITEM BELOW THAT APPLIES TO THIS LOAN

( ✓ )
check

Borrower/Guarantor **does not** intend to occupy the Property and the Loan is to acquire, improve, or maintain rental property that Borrower/Guarantor intends to lease or rent to a third party. Borrower/Guarantor certifies that:

A.  The Property that will secure this Loan is not the principal residence of Borrower/Guarantor.

B.  Borrower/Guarantor has no intention of ever making the Property securing the Loan his or her principal residence.

C.  Borrower/Guarantor will **not** use the Loan proceeds or the Property for **personal, family, or household purposes.**

D.  Borrower/Guarantor does **not** expect to occupy the Property (as a second home, vacation home, or otherwise) for more than 14 days during a year.

**DISCLOSURE: If your loan is approved, the final loan documents will prohibit any occurrence of items (A- D) as outlined above and Lender will have the right to place the loan in default and/or foreclosure if one of these representations is violated.**

( ___ )
check

Borrower/Guarantor **does intend to occupy** the Property for more than 14 days during a year (whether as a primary residence, second home, vacation home, or otherwise) and the purpose of the Loan is to acquire, improve, or maintain rental property that Borrower/Guarantor intends to lease or rent to a third party.

( ___ )
check

Borrower/Guarantor **does intend to occupy** the Property for more than 14 days during a year (whether as a primary residence, second home, vacation home, or otherwise) and the purpose of the Loan is other than to acquire, improve, or maintain rental property.

(continued on next page)

Call your AE today
## 866-505-FUND (3863)

2017-12-11 09:35:57 PST

EXHIBIT "8"

## CERTIFICATION OF OCCUPANCY DISCLOSURE (CONT'D)

If the above statements do not accurately describe the transaction, please provide an explanation:

_____

_____

_____

Borrower/Guarantor agrees to hold Lender harmless and agrees to defend, indemnify, protect and hold Lender and its agents, officers, contractors, and employees harmless from and against any and all claims asserted or liability established that arises from the falsity of any part of the declaration.

Borrower/Guarantor declares under penalty of perjury under the laws of the state where the property is located that the foregoing is true and correct.

**Applicant Signature:**

_____  Date: 12-12-17

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for | ☐ VA  ☐ FHA | ☐ Conventional  ☐ USDA/Rural Housing Service | ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|

| Amount | Interest Rate | No. of Months | Amortization Type: | ☐ Fixed Rate  ☐ GPM | ☐ Other (explain):  ☐ ARM (type): |
|---|---|---|---|---|---|
| $ 1,050,000. | % | | | | |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP)  3343 Keha Dr. Kihei, HI 96753 | | | No. of Units |
|---|---|---|---|

Legal Description of Subject Property (attach description if necessary) — Year Built

| Purpose of Loan | ☐ Purchase  ☐ Construction  ☐ Refinance  ☐ Construction-Permanent | ☐ Other (explain): | Property will be: ☐ Primary Residence  ☐ Secondary Residence  ☑ Investment |
|---|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ 0.00 |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements  ☐ made  ☐ to be made |
|---|---|---|---|---|
| 2016 | $ 1,000,000.00 | $ 740,000.00 | | Cost: $ |

| Title will be held in what Name(s)  Maui Meadows Management LLC | Manner in which Title will be held | Estate will be held in: ☑ Fee Simple  ☐ Leasehold (show expiration date) |
|---|---|---|

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

| | Borrower | | Co-Borrower |
|---|---|---|---|

| Borrower's Name (include Jr. or Sr. if applicable)  Steve M Warsh | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|

| Social Security Number  6662 | Home Phone (incl. area code)  808-442-2995 | DOB (MM/DD/YYYY)  1955 | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|

| ☐ Married  ☑ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower)  no.  ages | ☐ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower)  no.  ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☑ Own  ☐ Rent  1  No. Yrs.  575 Linekona Pl  Wailuku, HI 96753 | Present Address (street, city, state, ZIP)  ☐ Own  ☐ Rent _____ No. Yrs. |
|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP)  ☐ Own  ☑ Rent  18  No. Yrs.  585 Linekona Pl  Wailuku, HI 96793 | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent _____ No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | | Co-Borrower | |
|---|---|---|---|---|---|

| Name & Address of Employer  Maui Meadows Management LLC  616 Laniolu St.  Kihei, HI 96753 | ☑ Self Employed | Yrs. on this job  2.0  Yrs. employed in this line of work/profession  15.0 | Name & Address of Employer | ☐ Self Employed | Yrs. on this job  Yrs. employed in this line of work/profession |
|---|---|---|---|---|---|
| Position/Title/Type of Business  Property Mgmt | | Business Phone (incl. area code)  (808) 442-2995 | Position/Title/Type of Business | | Business Phone (incl. area code) |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer | ☐ Self Employed | Dates (from – to)  Monthly Income  $ | Name & Address of Employer | ☐ Self Employed | Dates (from – to)  Monthly Income  $ |
|---|---|---|---|---|---|
| Position/Title/Type of Business | | Business Phone (incl. area code) | Position/Title/Type of Business | | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from – to)  Monthly Income  $ | Name & Address of Employer | ☐ Self Employed | Dates (from – to)  Monthly Income  $ |
|---|---|---|---|---|---|
| Position/Title/Type of Business | | Business Phone (incl. area code) | Position/Title/Type of Business | | Business Phone (incl. area code) |

EXHIBIT "9"

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 4,000.00 | $ | $ 4,000.00 | Rent | $ | |
| Overtime | | | 0.00 | First Mortgage (P&I) | | $ |
| Bonuses | | | 0.00 | Other Financing (P&I) | | |
| Commissions | | | 0.00 | Hazard Insurance | | |
| Dividends/Interest | | | 0.00 | Real Estate Taxes | | |
| Net Rental Income | | | 0.00 | Mortgage Insurance | | |
| Other† (before completing, see the notice in "describe other income" below) | | | 0.00 | Homeowner Assn. Dues | | |
| | | | 0.00 | Other: | | |
| Total | $ 4,000.00 | $ 0.00 | $ 4,000.00 | Total | $ 0.00 | $ 0.00 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income  *Notice:* Alimony, child support, or separate maintenance income need not be revealed if the
Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☐ Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | | | |
| | | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| List checking and savings accounts below | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ | | | |
| Face amount: $ | | | | |
| Subtotal Liquid Assets | $ 0.00 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ | Acct. no. | | |
| Vested interest in retirement fund | $ | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ | | | |
| Automobiles owned (make and year) 1 | $ | Acct. no. | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | | | |
| | | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ | |
| Total Assets a. | $ 0.00 | Net Worth (a minus b) ▶ $ 0.00 | Total Liabilities b. | $ 0.00 |

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 3343 Keiha Dr Kihei, HI 96753 | R | SFR | $ 1,500,000 | $ 742,425 | $ 13,500 | $ 6,900 | $ 3,500 | $ 3,100 |
| 575 Linekona Pl Wailuku, HI 96793 | PR | SFR | 375,000 | 360,000 | | | | |
| | | | | | | | |
| | | | | | | | |
| | Totals | | $ 1,875,000 | $ 1,102,425 | $ 13,500 | $ 6,900 | $ 3,500 | $ 3,100 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | |
| f. Estimated closing costs | |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 0 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 0 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ | ☐ |
| b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☐ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☐ |
| d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☐ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | ☐ | ☑ | ☐ | ☐ |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ | ☑ | ☐ | ☐ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☐ |
| h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☐ |
| i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☐ |
| j. Are you a U.S. citizen? | ☑ | ☐ | ☐ | ☐ |
| k. Are you a permanent resident alien? | ☐ | ☑ | ☐ | ☐ |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☑ | ☐ | ☐ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | ☑ | ☐ | ☐ | ☐ |
| (1) What type of property did you own—principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home—solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 3-22-18 | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information. | CO-BORROWER | ☐ I do not wish to furnish this information. |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino  ☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino  ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American | Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander  ☑ White | | ☐ Native Hawaiian or Other Pacific Islander  ☐ White |
| Sex: | ☐ Female  ☐ Male | Sex: | ☐ Female  ☐ Male |

| To be Completed by Interviewer This application was taken by: ☐ Face-to-face interview ☐ Mail ☑ Telephone ☐ Internet | Interviewer's Name (print or type) Moses Soker | Name and Address of Interviewer's Employer Tangency Point 1521 Ventura Blvd #1008 Sherman Oaks, CA 91403 |
|---|---|---|
| | Interviewer's Signature | |
| | Interviewer's Phone Number (incl. area code) 951-275-1137 | |

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark **B** for Borrower or **C** for Co-Borrower. | Borrower: | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 3-27-14 | X | |

# HAWAII STANDARD RESIDENTIAL LEASE AGREEMENT

THIS AGREEMENT made this 10ᵗʰ Day of _January_, 20 21,

by and between _Maui Meadows Management LLC_ [name of landlord] of

_Paulette Santell   3343 KEHA_ [street address

of landlord] herein called "Landlord," and _Paulette Santell_

[name of tenant] of

_3343   KEHA   Kihei HI   96753_ [street address

of tenant] herein called "Tenant." Landlord hereby agrees to rent to Tenant the

dwelling located at

_____ SAME _____ under the

following terms and conditions.

1.     **FIXED-TERM AGREEMENT (LEASE):**    1 year

Tenants agree to lease this dwelling for a fixed term of ~~1/10/21~~, beginning

1/10/21 and ending 1/9/22. Upon expiration, this Agreement

shall become a month-to-month agreement AUTOMATICALLY, UNLESS either

Tenants or Owners notify the other party in writing at least 30 days prior to

expiration that they do not wish this Agreement to continue on any basis.

2.     RENT: 1800

Tenant agrees to pay Landlord as base rent the sum of $ 1800." per month,

due and payable monthly in advance on the 1ˢᵗ day of each month during the

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

term of this agreement.  The first month's rent is required to be submitted on or before move-in.


3.     **FORM OF PAYMENT**:

Tenants agree to pay their rent in the form of a personal check, a cashier's check, or a money order made out to the Landlord.


4.     **RENT PAYMENT PROCEDURE**:

Tenants agree to pay their rent by mail addressed to the Landlord (replace this with landlord's mailing address) 616 Laniola Pl Kihei, in person at the same address, or in such other way as the Landlord will advise the Tenant in writing.


5.     **RENT DUE DATE**:

Tenant hereby acknowledges that late payment will cause Landlord to incur costs not contemplated by this Rental Agreement. The landlord allows for a _____ day grace period. In the event rent is not received prior to the date plus the grace period, Tenant agrees to pay a $ 100. late fee, plus an additional $_____ per day for every day thereafter until the rent is paid. Neither ill health, loss of job, financial emergency, or other excuses will be accepted for late payment.


6.     **BAD-CHECK SERVICING CHARGE**:


© 2020 RentalLeaseAgreements.com. All Rights Reserved.

07/15/2021   11:18PM (GMT-05:00)

In the event Tenant's check is dishonored and returned unpaid for any reason to Landlord, Tenant agrees to pay a returned check charge of $_____ AND accept whatever consequences there might be in making a late payment. If for any reason a check is returned or dishonored, all future rent payments will be cash or money order.

7.   **SECURITY DEPOSIT**:

Tenants hereby agree to pay a security deposit of $___1000.___ to be refunded upon vacating, returning the keys to the Landlord and termination of this contract according to other terms herein agreed. This deposit will be held to cover any possible damage to the property. No interest will be paid on this money and in no case will it be applied to back or future rent. It will be held intact by Landlord until at least thirty (30) working days after Tenants have vacated the property. At that time Landlord will inspect the premises thoroughly and assess any damages and/or needed repairs. This deposit money minus any necessary charges for missing/dead light bulbs, repairs, cleaning, etc., will then be returned to Tenant with a written explanation of deductions, within 60 days after they have vacated the property.

8.   **CLEANING FEE**:

Tenant hereby agrees to accept property in its present state of cleanliness. They agree to return the property in the same condition or pay a $200 minimum cleaning fee if the Landlord has to have the property professionally cleaned.

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

9.      **REMOVAL OF LANDLORD'S PROPERTY**:

If anyone removes any property belonging to Landlord without the express written consent of the Landlord, this will constitute abandonment and surrender of the premises by Tenant and termination by them of this Rental Agreement. Landlord may also take further legal action.

10.     **CHANGES IN TERMS OF TENANCY**:

(This paragraph applies only when this Agreement is or has become a month-to-month agreement). Owners shall advise Tenants of any changes in terms of tenancy with advance notice of at least thirty (30) days. Changes may include notices of termination, rent adjustments, or other reasonable changes in the terms of this Agreement.

11.     **TENANT COOPERATION**:

Tenant agrees to cooperate with the Landlord is showing property to prospective tenants, prior to termination of occupancy.

12.     **TENANT INSURANCE**:

Landlord will not be liable for any loss of Tenant's property. Tenant hereby acknowledges this and agrees to make no such claims for any losses or damages against Landlord, his agents, or employees. Tenants agree to purchase insurance – at their own expense – sufficient to protect themselves and their

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

property from fire, theft, burglary, breakage, and electrical connections. They acknowledge that if they fail to procure such insurance, it is their responsibility and they alone shall bear the consequences.

13.    **ABANDONMENT**:

If Tenants leave the premises unoccupied for 15 days without paying rent in advance for that month, or while owing any back rent from previous months, which has remained unpaid, the Landlord and/or his representatives have the right to take immediate possession of the property and to bar the Resident from returning.  Landlord will also have the right to remove any property that the Residents have left behind and store it at the Tenant's expense.

14.    **OCCUPANTS**:

The number of occupants is limited to two (2) primary tenants & two (2) children. Only the Tenants may live in this building. Any additional residents residing in said dwelling for more than 2 weeks continuously must be added to this lease or receive written permission from the Landlord, subject to the same restrictions as the tenants, i.e. they must fill out an application. Nurses or maids required to care for the Tenants during an illness are an exception from this provision.

15.    **LOCK POLICY**:

48 hour notice verbally

© 2020 RentalLeaseAgreements.com. All Rights Reserved.



No additional locks will be installed on any door without the written permission of Landlord. Landlord will be given duplicate keys for all locks so installed at tenants' expense, before they are installed.

16.   **LOCKOUTS**:

Should tenants lock themselves out of their dwelling and be unable to gain access through their own resources, they may call upon professional locksmith or the Owners to let them in. In either case, they are responsible for payment of the charges and/or damages involved. Owners charge a fee of $15 for providing this service between the hours of 8 a.m. and 6 p.m., Monday through Friday, excepting holidays, and a fee of $25 for all other times.  This fee is due and payable when the service is provided.

17.   **CONDITION OF PREMISES**:

The Tenants hereby acknowledge that the said property is in good condition. If there is anything about the condition of the property that is not good, they agree to report it to the Landlord within 3 days of taking possession of the property. They agree that failure to file any written notice of defects will be legally binding proof that the property is in good condition at the time of occupancy.

18.   **INVENTORY AND INSPECTION RECORD**:

An inventory and inspection Record has been provided for the Tenants' use. Only after this has been filled out (within the 3-day time limit) will the Landlord

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

take any action to complete necessary repairs. Landlord warrants that all major

systems will be functional and in good repair at the time of possession. Light

switches, wall plugs, doors, windows, faucets, drains, locks, toilets, sinks, etc. will

either be in working order or will be repaired once the Tenants have completed

the Inspection and Inventory Record. Tenants are encouraged to report any

necessary repairs, no matter how slight, in writing, but they are advised that

Landlord does not normally repair or replace nonfunctional items such as paint,

carpets, etc., every time a property changes possession. Those items are

scheduled for repair/replacement at regular intervals regardless of tenant

turnover.


19.    **BALCONIES AND PORCHES**:

If your unit has a balcony, deck, or porch do not allow more than two people on

the structure at one time.


20.    **TENANT RESPONSIBILITY**:

Good housekeeping is expected of everyone. Tenant agrees to keep quarters

clean and in a sanitary condition.  The Tenants agree not to permit any

deterioration or destruction to occur while they are occupying the property.


21.    **ALTERATIONS**:

Tenant shall make no alterations, decorations, additions, or improvements in or

to the premises without Landlords' prior written consent, and then only by

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

contractors or mechanics, or other approved by Landlord. All alterations,

additions, or improvements upon the premises, made by either party, shall

become the property of the Landlord and shall remain upon, and be surrendered

with said premises, as a part thereof, at the end of the term hereof.

They acknowledge that they will be responsible for and pay any damage done by

rain, wind, hail, tornadoes, etc., if this damage is caused by leaving windows

open, allowing stoppage and/or overflow or water and/or sewage pipes, broken

windows or doors, torn screens, broken door and window locks, etc. or any

damage caused while Tenant has occupancy.

22.     **VEHICLES & GARAGE USE**:

Tenants agree to keep a maximum of 1 vehicle on premises or in the garage.

These vehicles must be both operable and currently licensed.  Tenants agree to

park their vehicles in assigned spaces and to keep those spaces clean of oil

drippings.  Tenants agree not to park boats, recreational trailers, utility trailers,

and the like on the premises without first obtaining Landlords' written permission.

23.     **UTILITIES**:

Resident will be responsible for payment of all utilities, telephone, gas, or other

bills incurred during their residency. They specifically authorize Landlord to

deduct amounts of unpaid bills from their Security Deposits in the event they

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

07/15/2021   11:18PM (GMT-05:00)

remain unpaid after termination of this agreement. The Landlord/Owner agrees to

only pay water, garbage, and sewer bills.


24.      **SERVICES**.  Landlord shall be responsible for the following utilities and

services in connection with the premises: _____ Water, Landscape

_____

_____

_____


Tenant shall be responsible for the following utilities and services in connection

with the Premises:

_____ 200  toward Electri _____

_____

_____


Tenant acknowledges that Landlord has fully explained to the Tenant the utility

rates, charges and services for which Tenant will be required to pay (if any),

other than those to be paid directly to the utility company furnishing the service.


25.      **NOTIFICATION OF SERIOUS BUILDING PROBLEMS**:

Tenant agrees to notify Landlord immediately if roof leaks, water spots appear on

ceiling, or at the first sign of termite activity. Tenants also agree to notify the

Owners immediately upon first discovering any signs of serious building


© 2020 RentalLeaseAgreements.com. All Rights Reserved.

problems such as foundation cracks, a tilting porch, a crack in plaster, buckling

drywall or siding, a spongy floor, a leaky water heater, etc. If the tenant does not

notify landlord in a prompt matter the tenant may be held financially responsible.

26.     **REASONABLE TIME FOR REPAIRS**:

Upon being notified by Tenants that there is some building defect in which is

hazardous to health, life, or safety, Owners shall undertake repairs as soon as

possible.  Should there be a delay of more than seventy-two (72) hours in making

repairs, due to difficulty in scheduling the work or obtaining parts or for any other

reason beyond the Owners' control, Owners agree to keep Tenants informed

about the progress of work.

27.     **DRAIN STOPPAGES**:

As of the date of this Agreement, Owners warrant that the dwelling's sewage

drains are in good working order and that they will accept the normal household

waste for which they were designed. They will not accept things such as diapers,

sanitary napkins, tampons, children's toys, wads of toilet paper, balls of hair,

grease, oil, table scraps, clothing, rags, sand, dirt, rocks, or newspapers.

Tenants agree to pay for clearing the drains of any and all stoppages except

those which the plumber who is called to clear the stoppage will attest in writing

were caused by defective plumbing, tree roots, or acts of God. Please use a

drain filter to save unnecessary time  & money with repairs.

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

28.    **BACKYARD & GARDENS**:

The Tenants agree to never use any form of pesticides (including rat poison,

roach sprays, etc), or fertilizers unless written permission is granted from the

Landlord.


29.    **NON-LIABILITY**:

The Tenants hereby state that work or repairs that need to be done will be

handled by competent professionals, unless Tenants are qualified and capable of

doing the work themselves and doing it properly, in a safe manner that meets all

federal, state, and local regulations and have written approval from the landlord.

Tenants further state that they will be legally responsible for any mishap they

either do themselves or hire others to do. Landlord will be held free from harm

and liability along with his agents and representatives. In the event that needed

repairs are beyond the Tenants' capacity, they are urged to arrange for

professional help.


30.    **DISCLOSURE OF LANDLORD/AGENT**:

The landlord or the authorized person/agent/company to act for and on behalf of

the Owner and where all notices by the tenant should be sent is located at the

following:


Name: _____ 616 Lanipl s M

Street Address: _____ Steep wAkJL


© 2020 RentalLeaseAgreements.com. All Rights Reserved.          Page 11 of 15

City: _K i h e i_    _H I_    Zip: _96753_

Telephone: _808  442  2995_

E-Mail: _SWARSL55@ Gmail.com_

31.    **ACCESS TO PREMISES**:

The Owner reserves the right to enter the residence at reasonable times to

inspect, make necessary repairs, supply services, or show it to prospective

residents, purchasers, workmen, or contractors. Whenever practicable, a two-day

notice of the Owner's intent to enter shall be given to the Resident.


32.    **SUBLETTING & ASSIGNMENT**:

Tenants shall not sublet the entire premises or any part of the premises, nor shall

they assign this Agreement to anyone else without first obtaining Landlords'

written permission. Prospective sub-lessee's or assignees must submit an

application to the Landlord and must agree to credit, background, reference, and

employment verification as well as the obligation to pay a non-refundable $25

application fee.  Permission to sublease will be determined by the sole discretion

of the Landlord.


33.    **PETS**:

Pets are allowed on the premises only by obtaining the Landlords' written

permission first. When possession of the property is given to the Tenant, only

those pets listed on the Rental Application will be allowed unless subsequent

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

written permission has been granted. "Pets" does not include animals trained to

serve the handicapped, such as seeing-eye dogs, hearing dogs, or service dogs.

These animals may be housed on the premises so long as they are in the direct

service of those they were trained to serve and so long as Landlord is notified in

advance in writing of the circumstances.  In any case, when permission is

granted, owners are required to pay an additional $_____ per month pet-rent

charge for one or more. Additionally, a pet-application sheet must be submitted

before move-in.


If problems with pets occur there are several ways it may be handled depending

on the events. If the pet is anyway dangerous it will not be allowed on the

premises.  In the event of the owner being negligent in regards to cleanup or

allowing access to areas that the pet could damage the tenant will be fined or

money will be taken from the deposit. If the pet is a nuisance in anyway the

landlord may make suggestions to how the pet is cared for or may require the

tenant to attend a training course to be approved by the landlord.


Pets are never to be allowed in the yard unsupervised. Cleaning up after the pet

is necessary immediately following defecation. Constant barking will not be

permitted.


34.     **TERMINATION UPON SALE OF PREMISES.**


© 2020 RentalLeaseAgreements.com. All Rights Reserved.

Notwithstanding any other provision of this Lease, Landlord may terminate this lease upon 45 days written notice to Tenant that the Premises have been sold.

35.   **WAIVER**:

All rights given to Landlord by this agreement shall be cumulative in addition to any laws that exist or might come into being. Any exercise of any rights by Landlord or failure to exercise rights shall not act as waiver of those or any other rights. No statement or promise by Landlord, its agents, or employees, as to tenancy, repairs, amount of rent to be paid, or other terms and conditions shall be binding unless it is put in writing and made a specific part of this agreement.

36.   **TERMS**:

In this agreement the singular number where used will include the plural, the masculine gender will include the feminine, the term Owner will include Landlord, Lessor; and the term Resident will include Tenant, Lessee.

37.   **GOVERNING LAW:** This Lease shall be governed by and construed in accordance with the laws of the State of _____ Hawaii

38.   **Tax Excise Number**. Landlord must furnish its tax excise number so that tenant may file for a low-income tax credit if they qualify. The landlord's tax excise number is

81-294 7025 _____. (Per Statute §521-43)

39.   **FULL DISCLOSURE**:

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

07/15/2021   11:18PM (GMT-05:00)



The Tenants signing this Rental Contract hereby state that all questions about this Rental Agreement have been answered, that they fully understand all the provisions of the agreement and the obligations and responsibilities of each party, as spelled out herein. They further state that they agree to fulfill their obligations in every respect or suffer the full legal and financial consequences of their actions or lack of action in violation of this agreement. Signature by the Tenant on this Rental Agreement is acknowledgement and he/she has received a signed copy of the Rental Agreement.

Accepted this _____9th_____ day of __January__, 20 21

_____
Tenant's Signature

_____

_____
Landlord-Manager-Agent's Signature

© 2020 RentalLeaseAgreements.com. All Rights Reserved.                    Page 15 of 15

07/15/2021   11:18PM (GMT-05:00)

8082426139     LAW OFFICE OF CAIN & HERREN     06:12:06 p.m.   07-15-2021   49 /63 **Copy**



## HAWAII STANDARD RESIDENTIAL LEASE AGREEMENT

Pursuant to Chapter 521 (Residential Landlord-Tenant Code)

THIS AGREEMENT made this **1st** Day of **March**, 20**21**, by and

between **Maui Meadows mgmt** [name of landlord] of **616 Laniolu Pl. Kihei HI 96753**

[street address of landlord] herein called "Landlord," and **Tom Kelley** [name of tenant] of

**3343 Kokua Kihei HI 96753** [street address of tenant] herein called "Tenant."

Landlord hereby agrees to rent to Tenant the dwelling located at

_____ under the following terms and conditions.

1.    **FIXED-TERM AGREEMENT (LEASE):**

Tenants agree to lease this dwelling for a fixed term of **One Year** beginning ~~month to month~~ **2-1-** and ending **2-1-22**

_____. Upon expiration, this Agreement shall become a month-to-month agreement AUTOMATICALLY,

UNLESS either Tenants or Owners notify the other party in writing at least 30 days prior to expiration that they do not wish

this Agreement to continue on any basis.

2.    **RENT:**

Tenant agrees to pay Landlord as base rent the sum of $ **1800** per month, due and payable monthly in advance on

the **1st** day of each month during the term of this agreement. The first month's rent is required to be submitted on or

before move-in.

3.    **FORM OF PAYMENT:**

Tenants agree to pay their rent in the form of a personal check, a cashier's check, or a money order made out to the

Landlord.

4.    **RENT PAYMENT PROCEDURE:**

Tenants agree to pay their rent by mail addressed to the Landlord (replace this with landlord's mailing

address)_____ **Same** _____, or in person at the same address, or in such other way as the Landlord

will advise the Tenant in writing.

5.    **RENT DUE DATE:**

Tenant hereby acknowledges that late payment will cause Landlord to incur costs not contemplated by this Rental

Agreement. The landlord allows for a **5** day grace period. In the event rent is not received prior to the date plus the

grace period, Tenant agrees to pay a $ **100** late fee, plus an additional $_____ per day for every day thereafter until the

rent is paid. Neither ill health, loss of job, financial emergency, or other excuses will be accepted for late payment.



6.    **BAD-CHECK SERVICING CHARGE:**

In the event Tenant's check is dishonored and returned unpaid for any reason to Landlord, Tenant agrees to pay a returned check charge of $35.00 AND accept whatever consequences there might be in making a late payment. If for any reason a check is returned or dishonored, all future rent payments will be cash or money order.

7.    **SECURITY DEPOSIT:**

Tenants hereby agree to pay a security deposit of $_____ to be refunded upon vacating, returning the keys to the Landlord and termination of this contract according to other terms herein agreed. This deposit will be held to cover any possible damage to the property. No interest will be paid on this money and in no case will it be applied to back or future rent. It will be held intact by Landlord until at least thirty (30) working days after Tenants have vacated the property. At that time Landlord will inspect the premises thoroughly and assess any damages and/or needed repairs. This deposit money minus any necessary charges for missing/dead light bulbs, repairs, cleaning, etc., will then be returned to Tenant with a written explanation of deductions, within 60 days after they have vacated the property.

8.    **CLEANING FEE:**

Tenant hereby agrees to accept property in its present state of cleanliness. They agree to return the property in the same condition or pay a $100 minimum cleaning fee if the Landlord has to have the property professionally cleaned.

9.    **REMOVAL OF LANDLORD'S PROPERTY:**

If anyone removes any property belonging to Landlord without the express written consent of the Landlord, this will constitute abandonment and surrender of the premises by Tenant and termination by them of this Rental Agreement. Landlord may also take further legal action.

10.    **CHANGES IN TERMS OF TENANCY:**

(This paragraph applies only when this Agreement is or has become a month-to-month agreement). Owners shall advise Tenants of any changes in terms of tenancy with advance notice of at least thirty (30) days. Changes may include notices of termination, rent adjustments, or other reasonable changes in the terms of this Agreement.

11.    **TENANT COOPERATION:**

Tenant agrees to cooperate with the Landlord is showing property to prospective tenants, prior to termination of occupancy.



12.     **TENANT INSURANCE:**

Landlord will not be liable for any loss of Tenant's property. Tenant hereby acknowledges this and agrees to make no

such claims for any losses or damages against Landlord, his agents, or employees. Tenants agree to purchase insurance

– at their own expense – sufficient to protect themselves and their property from fire, theft, burglary, breakage, and

electrical connections. They acknowledge that if they fail to procure such insurance, it is their responsibility and they alone

shall bear the consequences.

13.     **ABANDONMENT:**

If Tenants leave the premises unoccupied for 15 days without paying rent in advance for that month, or while owing any

back rent from previous months, which has remained unpaid, the Landlord and/or his representatives have the right to

take immediate possession of the property and to bar the Resident from returning. Landlord will also have the right to

remove any property that the Residents have left behind and store it at the Tenant's expense.

14.     **OCCUPANTS:**

The number of occupants is limited to two (2) primary tenants & two (2) children. Only the Tenants may live in this

building. Any additional residents residing in said dwelling for more than 2 weeks continuously must be added to this lease

or receive written permission from the Landlord, subject to the same restrictions as the tenants, i.e. they must fill out an

application. Nurses or maids required to care for the Tenants during an illness are an exception from this provision.

15.     **LOCK POLICY:**

No additional locks will be installed on any door without the written permission of Landlord. Landlord will be given

duplicate keys for all locks so installed at tenants' expense, before they are installed.

16.     **LOCKOUTS:**

Should tenants lock themselves out of their dwelling and be unable to gain access through their own resources, they may

call upon professional locksmith or the Owners to let them in. In either case, they are responsible for payment of the

charges and/or damages involved. Owners charge a fee of $15 for providing this service between the hours of 8 a.m. and

6 p.m., Monday through Friday, excepting holidays, and a fee of $25 for all other times. This fee is due and payable when

the service is provided.

17.     **CONDITION OF PREMISES:**

The Tenants hereby acknowledge that the said property is in good condition. If there is anything about the condition of the

property that is not good, they agree to report it to the Landlord within 3 days of taking possession of the property. They

agree that failure to file any written notice of defects will be legally binding proof that the property is in good condition at

the time of occupancy.



18. **INVENTORY AND INSPECTION RECORD:**

An inventory and inspection Record has been provided for the Tenants' use. Only after this has been filled out (within the 3-day time limit) will the Landlord take any action to complete necessary repairs. Landlord warrants that all major systems will be functional and in good repair at the time of possession. Light switches, wall plugs, doors, windows, faucets, drains, locks, toilets, sinks, etc. will either be in working order or will be repaired once the Tenants have completed the Inspection and Inventory Record. Tenants are encouraged to report any necessary repairs, no matter how slight, in writing, but they are advised that Landlord does not normally repair or replace nonfunctional items such as paint, carpets, etc., every time a property changes possession. Those items are scheduled for repair/replacement at regular intervals regardless of tenant turnover.

19. **BALCONIES AND PORCHES:**

If your unit has a balcony, deck, or porch do not allow more than two people on the structure at one time.

20. **TENANT RESPONSIBILITY:**

Good housekeeping is expected of everyone. Tenant agrees to keep quarters clean and in a sanitary condition. The Tenants agree not to permit any deterioration or destruction to occur while they are occupying the property.

21. **ALTERATIONS:**

Tenant shall make no alterations, decorations, additions, or improvements in or to the premises without Landlords' prior written consent, and then only by contractors or mechanics, or other approved by Landlord. All alterations, additions, or improvements upon the premises, made by either party, shall become the property of the Landlord and shall remain upon, and be surrendered with said premises, as a part thereof, at the end of the term hereof.

They acknowledge that they will be responsible for and pay any damage done by rain, wind, hail, tornadoes, etc., if this damage is caused by leaving windows open, allowing stoppage and/or overflow or water and/or sewage pipes, broken windows or doors, torn screens, broken door and window locks, etc. or any damage caused while Tenant has occupancy.

22. **VEHICLES & GARAGE USE:**

Tenants agree to keep a maximum of 1 vehicle on premises or in the garage. These vehicles must be both operable and currently licensed. Tenants agree to park their vehicles in assigned spaces and to keep those spaces clean of oil drippings. Tenants agree not to park boats, recreational trailers, utility trailers, and the like on the premises without first obtaining Landlords' written permission.

23.     **UTILITIES:**

Resident will be responsible for payment of all utilities, telephone, gas, or other bills incurred during their residency. They specifically authorize Landlord to deduct amounts of unpaid bills from their Security Deposits in the event they remain unpaid after termination of this agreement. The Landlord/Owner agrees to only pay water, garbage, and sewer bills.

24.     **SERVICES.** Landlord shall be responsible for the following utilities and services in connection with the premises:

water , sewer and trash

Tenant shall be responsible for the following utilities and services in connection with the Premises:

Electric -
cable / phone / Internet

Tenant acknowledges that Landlord has fully explained to the Tenant the utility rates, charges and services for which Tenant will be required to pay (if any), other than those to be paid directly to the utility company furnishing the service.

25.     **NOTIFICATION OF SERIOUS BUILDING PROBLEMS:**

Tenant agrees to notify Landlord immediately if roof leaks, water spots appear on ceiling, or at the first sign of termite activity. Tenants also agree to notify the Owners immediately upon first discovering any signs of serious building problems such as foundation cracks, a tilting porch, a crack in plaster, buckling drywall or siding, a spongy floor, a leaky water heater, etc. If the tenant does not notify landlord in a prompt matter the tenant may be held financially responsible.

26.     **REASONABLE TIME FOR REPAIRS:**

Upon being notified by Tenants that there is some building defect in which is hazardous to health, life, or safety, Owners shall undertake repairs as soon as possible. Should there be a delay of more than seventy-two (72) hours in making repairs, due to difficulty in scheduling the work or obtaining parts or for any other reason beyond the Owners' control, Owners agree to keep Tenants informed about the progress of work.

27.     **DRAIN STOPPAGES:**

As of the date of this Agreement, Owners warrant that the dwelling's sewage drains are in good working order and that they will accept the normal household waste for which they were designed. They will not accept things such as diapers, sanitary napkins, tampons, children's toys, wads of toilet paper, balls of hair, grease, oil, table scraps, clothing, rags, sand, dirt, rocks, or newspapers. Tenants agree to pay for clearing the drains of any and all stoppages except those which the plumber who is called to clear the stoppage will attest in writing were caused by defective plumbing, tree roots, or acts of God. Please use a drain filter to save unnecessary time & money with repairs.



No additional locks will be installed on any door without the written permission of Landlord. Landlord will be given duplicate keys for all locks so installed at tenants' expense, before they are installed.

16.   **LOCKOUTS**:

Should tenants lock themselves out of their dwelling and be unable to gain access through their own resources, they may call upon professional locksmith or the Owners to let them in. In either case, they are responsible for payment of the charges and/or damages involved. Owners charge a fee of $15 for providing this service between the hours of 8 a.m. and 6 p.m., Monday through Friday, excepting holidays, and a fee of $25 for all other times.  This fee is due and payable when the service is provided.

17.   **CONDITION OF PREMISES**:

The Tenants hereby acknowledge that the said property is in good condition. If there is anything about the condition of the property that is not good, they agree to report it to the Landlord within 3 days of taking possession of the property. They agree that failure to file any written notice of defects will be legally binding proof that the property is in good condition at the time of occupancy.

18.   **INVENTORY AND INSPECTION RECORD**:

An inventory and inspection Record has been provided for the Tenants' use. Only after this has been filled out (within the 3-day time limit) will the Landlord

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

take any action to complete necessary repairs. Landlord warrants that all major

systems will be functional and in good repair at the time of possession. Light

switches, wall plugs, doors, windows, faucets, drains, locks, toilets, sinks, etc. will

either be in working order or will be repaired once the Tenants have completed

the Inspection and Inventory Record. Tenants are encouraged to report any

necessary repairs, no matter how slight, in writing, but they are advised that

Landlord does not normally repair or replace nonfunctional items such as paint,

carpets, etc., every time a property changes possession. Those items are

scheduled for repair/replacement at regular intervals regardless of tenant

turnover.

19.   **BALCONIES AND PORCHES**:

If your unit has a balcony, deck, or porch do not allow more than two people on

the structure at one time.

20.   **TENANT RESPONSIBILITY**:

Good housekeeping is expected of everyone. Tenant agrees to keep quarters

clean and in a sanitary condition.  The Tenants agree not to permit any

deterioration or destruction to occur while they are occupying the property.

21.   **ALTERATIONS**:

Tenant shall make no alterations, decorations, additions, or improvements in or

to the premises without Landlords' prior written consent, and then only by

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

contractors or mechanics, or other approved by Landlord. All alterations,

additions, or improvements upon the premises, made by either party, shall

become the property of the Landlord and shall remain upon, and be surrendered

with said premises, as a part thereof, at the end of the term hereof.

They acknowledge that they will be responsible for and pay any damage done by

rain, wind, hail, tornadoes, etc., if this damage is caused by leaving windows

open, allowing stoppage and/or overflow or water and/or sewage pipes, broken

windows or doors, torn screens, broken door and window locks, etc. or any

damage caused while Tenant has occupancy.

22.    **VEHICLES & GARAGE USE**:

Tenants agree to keep a maximum of 1 vehicle on premises or in the garage.

These vehicles must be both operable and currently licensed.  Tenants agree to

park their vehicles in assigned spaces and to keep those spaces clean of oil

drippings.  Tenants agree not to park boats, recreational trailers, utility trailers,

and the like on the premises without first obtaining Landlords' written permission.

23.    **UTILITIES**:

Resident will be responsible for payment of all utilities, telephone, gas, or other

bills incurred during their residency. They specifically authorize Landlord to

deduct amounts of unpaid bills from their Security Deposits in the event they

© 2020 RentalLeaseAgreements.com. All Rights Reserved.                                     Page 8 of 15

07/15/2021   11:18PM (GMT-05:00)



remain unpaid after termination of this agreement. The Landlord/Owner agrees to

only pay water, garbage, and sewer bills.

24.     **SERVICES**.  Landlord shall be responsible for the following utilities and

services in connection with the premises: _____ _water, Landscape_

_____

_____

_____

Tenant shall be responsible for the following utilities and services in connection

with the Premises:

_____ _200 toward Electric_ _____

_____

_____

Tenant acknowledges that Landlord has fully explained to the Tenant the utility

rates, charges and services for which Tenant will be required to pay (if any),

other than those to be paid directly to the utility company furnishing the service.

25.     **NOTIFICATION OF SERIOUS BUILDING PROBLEMS**:

Tenant agrees to notify Landlord immediately if roof leaks, water spots appear on

ceiling, or at the first sign of termite activity. Tenants also agree to notify the

Owners immediately upon first discovering any signs of serious building

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

07/15/2021   11:18PM (GMT-05:00)

problems such as foundation cracks, a tilting porch, a crack in plaster, buckling
drywall or siding, a spongy floor, a leaky water heater, etc. If the tenant does not
notify landlord in a prompt matter the tenant may be held financially responsible.

26.     **REASONABLE TIME FOR REPAIRS**:

Upon being notified by Tenants that there is some building defect in which is
hazardous to health, life, or safety, Owners shall undertake repairs as soon as
possible.  Should there be a delay of more than seventy-two (72) hours in making
repairs, due to difficulty in scheduling the work or obtaining parts or for any other
reason beyond the Owners' control, Owners agree to keep Tenants informed
about the progress of work.

27.     **DRAIN STOPPAGES**:

As of the date of this Agreement, Owners warrant that the dwelling's sewage
drains are in good working order and that they will accept the normal household
waste for which they were designed. They will not accept things such as diapers,
sanitary napkins, tampons, children's toys, wads of toilet paper, balls of hair,
grease, oil, table scraps, clothing, rags, sand, dirt, rocks, or newspapers.
Tenants agree to pay for clearing the drains of any and all stoppages except
those which the plumber who is called to clear the stoppage will attest in writing
were caused by defective plumbing, tree roots, or acts of God. Please use a
drain filter to save unnecessary time  & money with repairs.

© 2020 RentalLeaseAgreements.com. All Rights Reserved.



28.    **BACKYARD & GARDENS**:

The Tenants agree to never use any form of pesticides (including rat poison, roach sprays, etc), or fertilizers unless written permission is granted from the Landlord.


29.    **NON-LIABILITY**:

The Tenants hereby state that work or repairs that need to be done will be handled by competent professionals, unless Tenants are qualified and capable of doing the work themselves and doing it properly, in a safe manner that meets all federal, state, and local regulations and have written approval from the landlord. Tenants further state that they will be legally responsible for any mishap they either do themselves or hire others to do. Landlord will be held free from harm and liability along with his agents and representatives. In the event that needed repairs are beyond the Tenants' capacity, they are urged to arrange for professional help.


30.    **DISCLOSURE OF LANDLORD/AGENT**:

The landlord or the authorized person/agent/company to act for and on behalf of the Owner and where all notices by the tenant should be sent is located at the following:


Name: _____ 616 Lanipl2M _____

Street Address: _____ Steve WAeJL _____

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

City: _K̲i̲h̲e̲i̲_____ _H̲I̲___ Zip: _9̲6̲7̲5̲3̲_

Telephone: _8̲0̲8̲___4̲4̲2̲___2̲9̲9̲5̲_

E-Mail: _S̲w̲A̲R̲S̲L̲5̲5̲@̲_G̲m̲a̲i̲l̲.̲C̲o̲m̲_

31.    **ACCESS TO PREMISES**:

The Owner reserves the right to enter the residence at reasonable times to

inspect, make necessary repairs, supply services, or show it to prospective

residents, purchasers, workmen, or contractors. Whenever practicable, a two-day

notice of the Owner's intent to enter shall be given to the Resident.

32.    **SUBLETTING & ASSIGNMENT**:

Tenants shall not sublet the entire premises or any part of the premises, nor shall

they assign this Agreement to anyone else without first obtaining Landlords'

written permission. Prospective sub-lessee's or assignees must submit an

application to the Landlord and must agree to credit, background, reference, and

employment verification as well as the obligation to pay a non-refundable $25

application fee.  Permission to sublease will be determined by the sole discretion

of the Landlord.

33.    **PETS**:

Pets are allowed on the premises only by obtaining the Landlords' written

permission first. When possession of the property is given to the Tenant, only

those pets listed on the Rental Application will be allowed unless subsequent

© 2020 RentalLeaseAgreements.com. All Rights Reserved.                    Page 12 of 15



written permission has been granted. "Pets" does not include animals trained to serve the handicapped, such as seeing-eye dogs, hearing dogs, or service dogs. These animals may be housed on the premises so long as they are in the direct service of those they were trained to serve and so long as Landlord is notified in advance in writing of the circumstances.  In any case, when permission is granted, owners are required to pay an additional $_____ per month pet-rent charge for one or more. Additionally, a pet-application sheet must be submitted before move-in.

If problems with pets occur there are several ways it may be handled depending on the events. If the pet is anyway dangerous it will not be allowed on the premises.  In the event of the owner being negligent in regards to cleanup or allowing access to areas that the pet could damage the tenant will be fined or money will be taken from the deposit. If the pet is a nuisance in anyway the landlord may make suggestions to how the pet is cared for or may require the tenant to attend a training course to be approved by the landlord.

Pets are never to be allowed in the yard unsupervised. Cleaning up after the pet is necessary immediately following defecation. Constant barking will not be permitted.

34.     **TERMINATION UPON SALE OF PREMISES.**

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

Notwithstanding any other provision of this Lease, Landlord may terminate this lease upon 45 days written notice to Tenant that the Premises have been sold.

35.    **WAIVER**:

All rights given to Landlord by this agreement shall be cumulative in addition to any laws that exist or might come into being. Any exercise of any rights by Landlord or failure to exercise rights shall not act as waiver of those or any other rights. No statement or promise by Landlord, its agents, or employees, as to tenancy, repairs, amount of rent to be paid, or other terms and conditions shall be binding unless it is put in writing and made a specific part of this agreement.

36.    **TERMS**:

In this agreement the singular number where used will include the plural, the masculine gender will include the feminine, the term Owner will include Landlord, Lessor; and the term Resident will include Tenant, Lessee.

37.    **GOVERNING LAW:** This Lease shall be governed by and construed in accordance with the laws of the State of _____Hawaii

38.    **Tax Excise Number**. Landlord must furnish its tax excise number so that tenant may file for a low-income tax credit if they qualify. The landlord's tax excise number is 81-294 7025_____. (Per Statute §521-43)

39.    **FULL DISCLOSURE**:

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

07/15/2021   11:18PM (GMT-05:00)

The Tenants signing this Rental Contract hereby state that all questions about this Rental Agreement have been answered, that they fully understand all the provisions of the agreement and the obligations and responsibilities of each party, as spelled out herein. They further state that they agree to fulfill their obligations in every respect or suffer the full legal and financial consequences of their actions or lack of action in violation of this agreement. Signature by the Tenant on this Rental Agreement is acknowledgement and he/she has received a signed copy of the Rental Agreement.

Accepted this _____ 1st _____ day of ___ December ___, 20 2 0

_____
Tenant's Signature

_____
Landlord-Manager-Agent's Signature

© 2020 RentalLeaseAgreements.com. All Rights Reserved.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>STEVEN MICHAEL WARSH,<br><br>      Debtor. | CASE NO.  21-00952<br>(Chapter 13)<br><br>DECLARATION OF ERIKA S.<br>GUSTIN; EXHIBITS "11" – "13" |

## <u>DECLARATION OF ERIKA S. GUSTIN</u>

I, ERIKA S. GUSTIN, declare:

1.      I am an attorney at law affiliated with the law firm of Carlsmith

Ball LLP, licensed to practice before the Courts of the State of Hawaiʻi and before

this Court.

2.      I represent Plaintiff U.S. BANK NATIONAL ASSOCIATION,

AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST

2018-2 ("**U.S. Bank**") in this action.  I have personal knowledge of the facts stated

below and would be competent to testify to the same, unless otherwise noted.

3.      I submit this declaration in support of U.S. Bank's *Motion For*

*Order Confirming That Automatic Stay And Co-Debtor Stay Are Not Applicable*.

4.      Attached hereto as Exhibit "11" is a true and correct copy of the

Findings of Fact, Conclusions of Law, and Order Granting Plaintiff U.S. Bank

National Association, As Trustee for Velocity Commercial Capital Loan Trust

2018-2's Motion for Summary Judgment As To All Defendants And for Interlocutory Decree of Foreclosure filed June 21, 2021; Exhibit "A", entered on August 3, 2021 by the Honorable Peter T. Cahill of the Circuit Court of the Second Circuit, State of Hawai'i in the foreclosure action against Maui Meadows Management LLC ("**Maui Meadows**"), Civil No. 2CCV-21-0000046 ("**Foreclosure Action**").

        5.     Because Maui Meadows and Steven M. Warsh (the "**Debtor**") refused to cooperate with the court-appointed Foreclosure Commissioner, my office filed a Motion to Sell Without Open House on behalf of U.S. Bank in the above-referenced Foreclosure Action.  Attached hereto as Exhibit "12" is a true and correct copy of the Order granting U.S. Bank's Motion to Sell Without Open House, entered on September 13, 2021.

        6.     Before initiating the Foreclosure Action, my office requested and obtained a Litigation Guarantee and title report.  That Litigation Guarantee shows that Maui Meadows is the legal owner of the property located at 3343 Keha Drive, Kihei, Maui, Hawai'i 96753, Tax Map Key No. 2-2-1-019-003, which property is the subject of the Foreclosure Action.  Attached hereto as Exhibit "13" is a true and correct copy of the Litigation Guarantee.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of October, 2021, in Honolulu, Hawaiʻi.


/s/ Erika S. Gustin
ERIKA S. GUSTIN

CARLSMITH BALL LLP

CRAIG G. NAKAMURA      2062
CATHERINE L. M. HALL      9973
One Main Plaza, Suite 400
2200 Main Street, P.O. Box 1086
Wailuku, Maui, HI 96793-1086
Tel No. 808.242.4535
Fax No. 808.244.4974
cnakamura@carlsmith.com
chall@carlsmith.com

ERIKA S. GUSTIN      11188
ASB Tower, Suite 2100
1001 Bishop Street
Honolulu, HI 96813
Tel No. 808.523.2500
Fax No. 808.523.0842
egustin@carlsmith.com

Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION,
AS TRUSTEE FOR VELOCITY COMMERCIAL
CAPITAL LOAN TRUST 2018-2

Electronically Filed
SECOND CIRCUIT
2CCV-21-0000046
03-AUG-2021
01:32 PM
Dkt. 46 FOF

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2,<br><br>       Plaintiff,<br><br>  vs.<br><br>MAUI MEADOWS MANAGEMENT LLC; STEVEN M. WARSH; JOHN DOES 1-20; JANE DOES 1-20; DOE PARTNERSHIPS 1-20; DOE CORPORATIONS 1-20; DOE ENTITIES 1-20; AND DOE GOVERNMENTAL UNITS 1-20<br><br>       Defendants. | CIVIL NO. 2CCV-21-0000046 (FORECLOSURE)<br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING PLAINTIFF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION FOR SUMMARY JUDGMENT AS TO ALL DEFENDANTS AND FOR INTERLOCUTORY DECREE OF FORECLOSURE, FILED JUNE 21, 2021; EXHIBIT "A"<br><br>*(caption continued)* |

4845-8321-9956.2.070824-00001

EXHIBIT "11"

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING PLAINTIFF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION FOR SUMMARY JUDGMENT AS TO ALL DEFENDANTS AND FOR INTERLOCUTORY DECREE OF FORECLOSURE, FILED JUNE 21, 2021

*Plaintiff U.S. Bank National Association, As Trustee For Velocity Commercial Capital Loan Trust 2018-2's Motion for Summary Judgment as to All Defendants and for Interlocutory Decree of Foreclosure*, filed June 21, 2021 (**"Motion"**) came on for hearing before the Honorable Peter T. Cahill on July 21, 2021, at 8:15 a.m. and on July 28, 2021 at 8:15 a.m.  Erika S. Gustin, Esq. appeared via Webex on behalf of Plaintiff U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2 (**"Plaintiff"**).  Michael J. Collins, Esq. appeared on behalf of Defendant MAUI MEADOWS MANAGEMENT LLC (**"Defendant Maui Meadows"**) and Defendant STEVEN M. WARSH (**"Defendant Warsh"**) (Defendant Maui Meadows and Defendant Warsh together are collectively referred to as **"Defendants"**);

The Court having considered the Motion, the Memorandum in Support of the Motion, the Declaration of Gloria-Jane Meyer and attached exhibits, the Opposition to the Motion filed by Defendants, Plaintiff's Reply in Support of the Motion, the Supplemental Declaration of Gloria-Jane Meyer, and having considered the arguments of counsel at the hearing, the pleadings and records on file herein, and good cause appearing therefor, the Court hereby finds, concludes, and orders as follows:

## FINDINGS OF FACT

To the extent that any of the following Findings of Fact shall be determined to be Conclusions of Law, they shall be deemed as such.

1.      Plaintiff is a National Bank doing business in the State of Hawaii.

2.      Defendant Maui Meadows is a manager managed Hawai'i limited liability company.

3.      Defendant Warsh is a resident of the County of Maui, State of Hawai'i.

4.      On or about March 27, 2018, for and in consideration of a loan made by Velocity Commercial Capital, LLC ("**Velocity**") to Defendant Maui Meadows in the principal sum of ONE MILLION, FIFTY THOUSAND DOLLARS AND NO/100 DOLLARS ($1,050,000.00), Defendant Maui Meadows made, executed and delivered to Velocity a Semi-annual Adjustable Term Note ("**Note**").

5.      Defendant Warsh, as Guarantor, executed that certain Unlimited Guaranty dated March 27, 2018 ("**Guaranty**"), pursuant to which Defendant Warsh jointly and severally, absolutely, unconditionally, and irrevocably guaranteed the full and punctual payment of all sums due and owing under the Note.

6.      For the purpose of securing payment of the principal sum, interest, and all other charges as provided for in the Note, Defendant Maui Meadows made, executed, and delivered to Velocity that certain Commercial Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated March 27, 2018 and recorded on April 3, 2018 in the Bureau of Conveyances of the State of Hawai'i as Document No. A-66670104 ("**Mortgage**"). The Mortgage created a lien on real property located at 3343 Keha Drive, Kihei, Maui, Hawai'i

96753, Tax Map Key No. 2-2-1-019-003 ("**Property**"), which Property is described more fully in Exhibit "A" attached hereto and made a part hereof.

7.      On or about August 27, 2019, Velocity executed an Allonge to $1,050,000.00 Promissory Note dated March 27, 2018 ("**Allonge**") and an Assignment of Collateral Agreements and Other Loan Documents ("**Collateral Assignment**"), transferring all right, title, and interest of Velocity in and to the Note and associated loan documents to Plaintiff, and indorsing the Note to Plaintiff.

8.      Velocity also executed an Assignment of Commercial Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing to Plaintiff on October 30, 2020 ("**Assignment**").  Said Assignment was recorded in the Bureau on November 2, 2020 as Document No. A76110379.

9.      The Note, the Guaranty, the Mortgage, the Allonge, the Collateral Assignment, and the Assignment are collectively referred to as the "Loan Documents."  Plaintiff is the owner and holder of the Loan Documents.

10.     Defendant Maui Meadows defaulted on its obligations under the terms of the Loan Documents by reason of failure to make the payments as required under the terms of the Note.

11.     By reason of the foregoing default, Plaintiff exercised its option under the terms of the Loan Documents to declare the entire balance of the Note due thereunder, together with interest, immediately due and payable.

12.     Due notice was given to Defendants for payment of all amounts owing under the Note, but Defendants have failed to pay the sums due under the Note.

13.        Plaintiff was the owner and holder of the Note prior to and at the time the

foreclosure proceedings were commenced through the filing of the Complaint herein on February

12, 2021.

14.        As of April 7, 2021, there was due and owing the amount of $1,259,770.54,

calculated as follows:

| | | |
|---|---|---|
| Unpaid Principal | $ | 1,033,390.72 |
| Interest through April 30, 2021 | $ | 95,045.99 |
| Default Interest | $ | 103,747.90 |
| Late Charges | $ | 2,016.55 |
| Deferred Late Charges | $ | 7,259.58 |
| Corporate Advance | $ | 10,101.24 |
| Escrow Advance | $ | 7,812.56 |
| NSF Check Fees | $ | 360.00 |
| TOTAL DUE | $ | 1,259,770.54 |

Interest continues to accrue at the rate of 8.490% per annum from and including May 1, 2020 to

the date the proceeds from the foreclosure sale are disbursed to Plaintiff. Additionally, default

interest continues to accrue on the Note at the rate of 4.0% per annum, from and including May

1, 2020 to the date the proceeds from the foreclosure sale are disbursed to Plaintiff. Attorney's

fees and litigation expenses will also continue to accrue.

15.        By reason of the above facts, Plaintiff is entitled to the foreclosure of the

Mortgage and to the sale of the Property.

16.        There is no just reason to delay entry of judgment on the findings of fact,

conclusions of law and orders set forth herein.

## CONCLUSIONS OF LAW

To the extent that any of the following Conclusions of Law shall be determined to be Findings of Fact, they shall be deemed as such.

1.      This Court has jurisdiction over the parties and the subject matter of this case, including the Property; and venue is proper in this circuit.

2.      The Mortgage is a valid first mortgage lien on the Property over any other liens and encumbrances thereon, except for the lien of any delinquent real property taxes.

3.      Defendant Maui Meadows is in default under the terms of the Loan Documents by reason of the failure to make payments as required thereunder.

4.      Plaintiff is entitled to the entry of summary judgment and interlocutory decree of foreclosure against all parties in this foreclosure action, on the grounds that no genuine issue of material fact exists, and Plaintiff is entitled to summary judgment and an interlocutory decree of foreclosure as a matter of law.

5.      Plaintiff also is entitled to an award of attorney's fees and costs under the terms and conditions of the Loan Documents.

6.      As there is no just reason for delay, this Court expressly concludes and directs that final judgment be entered as to Plaintiff's entitlement to foreclosure upon the Property.

**ORDER GRANTING PLAINTIFF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION FOR SUMMARY JUDGMENT AS TO ALL DEFENDANTS AND FOR INTERLOCUTORY DECREE OF FORECLOSURE, FILED JUNE 21, 2021**

Pursuant to the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.      Summary judgment and an interlocutory decree of foreclosure in favor of Plaintiff and against Defendant Maui Meadows and Defendant Warsh is hereby entered. This Court

expressly directs that said summary judgment and interlocutory decree of foreclosure be entered as a final judgment under Rule 54(b) of the Hawai'i Rules of Civil Procedure as there is no just reason for delay.

2.　　　　Defendant Maui Meadows is in default under the terms and conditions of the Loan Documents described above.

3.　　　　Interest, late fees, attorney's fees and costs, and such other amounts as the Court determines appropriate, continue to accrue until the date of final judgment or until paid, whichever occurs first.

4.　　　　Shackley Raffetto, Esq., 215 Alanuiliilii Place, Kula, HI 96790, (808)878-3112, is hereby appointed Commissioner of this Court in this action, and, as Commissioner, is authorized and directed to sell the Property, at a public or private sale or sales for cash in lawful currency of the United States of America, under such terms and conditions as herein set forth and to make and deliver to a purchaser an appropriate instrument(s) of conveyance of title to the Property upon confirmation of the sale by this Court. The Commissioner shall publish notice of the sale of the Property in the Maui News, a newspaper of general circulation in the county in which Property is located, once each week for three (3) consecutive weeks, with the auction to take place no sooner than fourteen (14) days after the date of publication of the third advertisement, in accordance with the requirements of Section 667-20 of the Hawai'i Revised Statutes. No bond shall be required of the Commissioner. In the event that the Commissioner is unable or unwilling to act as Commissioner, this Court may appoint another without notice or hearing. The Commissioner's fees and costs shall be deemed to be secured by the Mortgage.

5.　　　　In the event that the Property is sold at public auction, there shall be no upset price at the sale, and the Property shall be sold "As Is." Upon fall of the hammer, the successful

bidder shall pay a down payment to the Commissioner, by cash or certified check, in an amount not less than ten percent (10%) of the successful bid price, with the exception of Plaintiff, who may use the amount of its secured indebtedness as the required ten percent (10%) down payment. The balance shall be paid concurrently with delivery of the documents transferring title. The purchaser shall pay closing costs, including but not limited to costs of conveyance, recordation, and costs of possession. Real property taxes shall be prorated as of delivery of the documents transferring title. Such sale shall not be final until approved by the Court.

6.    Plaintiff or its designee is authorized to be a purchaser at any sale, without the requirement of any down payment at said sale. If Plaintiff is the highest bidder, payment of the down payment and the balance of the sale price shall be made by offset against the amount owed to Plaintiff under the Loan Documents.

7.    In the event the Commissioner or the Court determines that it would be appropriate to reopen bids in Court at the hearing to confirm the sale, such reopened court bidding will be allowed on the condition that any such reopened court bid is at least five percent (5%) higher than the highest bid received at the public auction.

8.    Upon closing of the foreclosure sale herein authorized, Defendants Maui Meadows and Mr. Warsh, and any and all persons claiming any interest in the Property by, through or under Defendants Maui Meadows and Mr. Warsh, are forever barred and foreclosed of and from any and all rights, title, and interest and claims at law or in equity in and to the Property.

9.    Final judgment is entered herein pursuant to Rule 54(b) of the Hawaii Rules of Civil Procedure, as there is no just reason for delay.

10.    This Court retains jurisdiction to ascertain the total amount that is due and owing

to Plaintiff, consisting of the principal amount due under the Loan Documents, together with

interest, advances, late charges, expenses, costs, and attorney's fees thereon to the date of

conveyance of the Property by the Commissioner.

11.    This Court further retains jurisdiction, to determine, among other matters which

may later come before this Court, the amount of fees and costs of the Commissioner and of

Plaintiff's attorneys, and the amount of deficiency Judgment against Defendant Maui Meadows

and Defendant Warsh.

12.    There is no just reason for delay and this order shall be considered a final

judgment after its effective date.

DATED:  Wailuku, Maui Hawai'i, _____August 3, 2021_____.

_____
JUDGE OF THE ABOVE-ENTITLED COURT

APPROVED AS TO FORM:

*/s/ Michael J. Collins*
MICHAEL J. COLLINS

Attorney for Defendants
MAUI MEADOWS MANAGEMENT LLC
and STEVEN M. WARSH

*U.S. Bank National Association, as Trustee For Velocity Commercial Capital Loan Trust 2018-2*
*v. Maui Meadows Management LLC; et al.;* Circuit Court of the Second Circuit, State of
Hawai'i, Civil No. 2CCV-20-0000046; FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
FOR INTERLOCUTORY DECREE OF FORECLOSURE, FILED JUNE 21, 2021; EXHIBIT
"A"

**EXHIBIT "A"**

Property Description

# EXHIBIT "A"

**Order No.:** 041700936

**For Tax Map ID(s):** **2-2-1-019-003**

All of that certain parcel of land situate at Makawao, Island and County of Maui, State of Hawaii, described as follows:

Lot 234, area 0.538 acres, more or less, as delineated on the map entitled "MAUI MEADOWS SUBDIVISION, UNIT III", which said map was filed in the Bureau of Conveyances of the State of Hawaii as File Plan No. 1236.

Being all the property conveyed by the following:

Commissioner's Deed

| | |
|---|---|
| Grantor: | Joseph Toma, Esq., as Commissioner of the State of Hawaii, County of Maui |
| Grantee: | Maui Meadows Management, LLC, a Hawaiian Limited Liability Company |
| Dated: | April 13, 2016 |
| Recording Date: | April 18, 2016 |
| Recording No.: | A-59520222 |

CARLSMITH BALL LLP

CRAIG G. NAKAMURA          2062
CATHERINE L. M. HALL       9973
One Main Plaza, Suite 400
2200 Main Street, P.O. Box 1086
Wailuku, Maui, HI 96793-1086
Tel No. 808.242.4535
Fax No. 808.244.4974
cnakamura@carlsmith.com
chall@carlsmith.com

ERIKA S. GUSTIN            11188
ASB Tower, Suite 2100
1001 Bishop Street
Honolulu, HI 96813
Tel No. 808.523.2500
Fax No. 808.523.0842
egustin@carlsmith.com

Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION,
AS TRUSTEE FOR VELOCITY COMMERCIAL
CAPITAL LOAN TRUST 2018-2

**Electronically Filed
SECOND CIRCUIT
2CCV-21-0000046
13-SEP-2021
02:03 PM
Dkt. 61 ORDG**

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2,<br><br>Plaintiff,<br><br>vs.<br><br>MAUI MEADOWS MANAGEMENT LLC; STEVEN M. WARSH; JOHN DOES 1-20; JANE DOES 1-20; DOE PARTNERSHIPS 1-20; DOE CORPORATIONS 1-20; DOE ENTITIES 1-20; AND DOE GOVERNMENTAL UNITS 1-20<br><br>Defendants. | CIVIL NO. 2CCV-21-0000046 (FORECLOSURE)<br><br>ORDER GRANTING PLAINTIFF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION TO SELL WITHOUT OPEN HOUSE, FILED AUGUST 16, 2021; CERTIFICATE OF SERVICE<br><br>**Hearing**:<br>Date: September 8, 2021<br>Time: 8:15 a.m.<br>Judge: Honorable Peter T. Cahill<br><br>Trial Date: Not Set |

EXHIBIT "12"

**ORDER GRANTING PLAINTIFF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION TO SELL WITHOUT OPEN HOUSE, FILED AUGUST 16, 2021**

Plaintiff U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY COMMERCIAL CAPITAL LOAN TRUST 2018-2's (**"Plaintiff"**) Motion to Sell without Open House, filed herein on August 16, 2021 (the **"Motion"**), came on for a hearing before the Honorable Peter T. Cahill on September 8, 2021 at 8:15 a.m. Erika S. Gustin, Esq. appeared via Zoom on behalf of Plaintiff. Michael J. Collins, Esq. appeared via Zoom on behalf of Defendants Maui Meadows Management LLC and Steven M. Warsh (**"Defendants"**). No other parties or persons appeared.

The Court, having considered the Motion and Commissioner's Declaration attached thereto, Defendants' Statement of Non-Opposition, the arguments of counsel, and the pleadings and files on record herein, and good cause appearing therefore, hereby ORDERS as follows:

1.      The Motion is GRANTED in full.

2.      The Commissioner shall proceed with the foreclosure sale without inspection, holding of any open houses, or otherwise showing the interior of the Property, or taking physical control of the Property.

3.      Plaintiff's counsel shall inform Defendants' counsel of the date set for the foreclosure sale, per the request of Defendants' counsel.

DATED:  Wailuku, Maui, Hawaii, _____ SEP 1 3 2021 _____.

JUDGE OF THE ABOVE-ENTITLED COURT

*CIRCUIT COURT SECOND CIRCUIT*
*SEAL*
*STATE OF HAWAII*

APPROVED AS TO FORM:


*/s/ Michael J. Collins, Esq.*
MICHAEL J. COLLINS, ESQ.

Attorney for Defendants
MAUI MEADOWS MANAGEMENT LLC and STEVEN M. WARSH

_____

*U.S. Bank National Association, As Trustee for Velocity Commercial Capital Loan Trust 2018-2
v. Maui Meadows Management LLC et al.*; 2CCV-21-0000046; ORDER GRANTING
PLAINTIFF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR VELOCITY
COMMERCIAL CAPITAL LOAN TRUST 2018-2'S MOTION TO SELL WITHOUT OPEN
HOUSE, FILED AUGUST 16, 2021

# CLTA LITIGATION

Issued By:



SUBJECT TO THE EXCLUSIONS FROM COVERAGE, AND THE GUARANTEE CONDITIONS ATTACHED HERETO AND MADE A PART OF THIS GUARANTEE, AND FURTHER SUBJECT TO ANY EXCEPTIONS SET OUT IN SCHEDULE B OF THIS GUARANTEE, AND ALSO THE LAWS OF THE STATE OF HAWAII,

## FIDELITY NATIONAL TITLE INSURANCE COMPANY
hereinafter called the Company

## GUARANTEES
the Assured named in Schedule A of this Guarantee

against loss or damage not exceeding the Amount of Liability stated in Schedule A sustained by the Assured by reason of any incorrectness in the Assurances set forth in Schedule A of this Guarantee.

**Fidelity National Title Insurance Company**

By:

_____

**Fidelity National Title and Escrow of Hawaii, Inc.**
**201 Merchant Street, Suite 2100**
**Honolulu, HI 96813**

President

Attest:

Countersigned By:

_____

SEAL

_____
Secretary

_____
Authorized Officer or Agent

EXHIBIT "13"

| ISSUING OFFICE: |
|---|
| Fidelity National Title and Escrow of Hawaii, Inc.<br>201 Merchant Street, Suite 2100<br>Honolulu, HI 96813<br>Main Phone: 808-536-0404 |

## SCHEDULE A

| Amount of Liability | Fee | Title Officer |
|---|---|---|
| $15,000.00 | $450.00 | |

Date of Guarantee:     September 24, 2020 at 08:01 AM

1.  Name of Assured:   Velocity Commercial Capital, LLC

2.  The estate or interest in the Land that is the subject of this Guarantee is:

    Fee Simple, Regular System

3.  The Land referred to in this Guarantee is situated in the State of Hawaii, County of Maui, and is described as follows:

    SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

4.  This Litigation Guarantee is furnished solely for the purpose of facilitating the filing of an action to Foreclose Mortgage. It shall not be used or relied upon for any other purpose without the written consent of the Company.

5.  ASSURANCES:

    According to the Public Records as of the Date of Guarantee,

    a.  Title to the estate or interest in the Land is vested in:

        Maui Meadows Management, LLC, a Hawaiian Limited Liability Company

    b.  Except for the matters shown in Schedule B, there are no defects, liens, encumbrances or other matters affecting title to the estate or interest in the Land, which matters are not necessarily shown in the order of their legal priority.

    c.  The current interest holders claiming some right, title or interest by reason of the matters shown in Part II of Schedule B are as shown therein. The vestee named herein and parties claiming to have some right, title or interest by reason of the matters shown in Part II of Schedule B may be necessary party defendant in an action, the nature of which is referred to above in paragraph 4.

    d.  The current interest holders claiming some right, title or interest by reason of the matters shown in Part I of Schedule B may also be necessary party defendant in an action, the nature of which is referred to above in paragraph 4. However, no return address for mailing after recording is shown in Schedule C as to those current interest holders.

    e.  The return address for mailing after recording address, if any, as shown on each document referred to in Part II of Schedule B by specific recording information, and as shown on the document(s) vesting title as shown above in paragraph 5(a), are as shown in Schedule C.

### END OF SCHEDULE A

# EXHIBIT "A"
## Legal Description

**For Tax Map ID(s):     2-2-1-019-003**

All of that certain parcel of land situate at Makawao, Island and County of Maui, State of Hawaii, described as follows:

Lot 234, area 0.538 acres, more or less, as delineated on the map entitled "MAUI MEADOWS SUBDIVISION, UNIT III", which said map was filed in the Bureau of Conveyances of the State of Hawaii as File Plan No. 1236.

Being all the property conveyed by the following:

Commissioner's Deed

Grantor:          Joseph Toma, Esq., as Commissioner
Grantee:          Maui Meadows Management, LLC, a Hawaiian Limited Liability Company
Dated:            April 13, 2016
Recording Date:   April 18, 2016
Recording No.:    A-59520222

# SCHEDULE B

## PART I

1.   (a)  Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.   Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.   Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.   Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the land and not shown by the Public Records.

5.   (a) Unpatented mining claims: (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or ( c) are shown by the Public Records.

6.   Any lien or right to a lien for services, labor or material not shown by the public records.

7.   Property taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2020-2021, Tax Map Key 2-2-1-019-003.

   1st installment:  $4,495.53 Paid
   2nd installment: $4,495.53 Due February 22, 2021

8.   Mineral and water rights of any nature in favor of the State of Hawaii.

9.   Covenants, conditions and restrictions (deleting therefrom any restrictions indicating any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin) as set forth in the following:

   Declaration of Restrictive Covenants

   Dated:          November 5, 1971
   Recording Date:January 5, 1972
   Recording No.:  Liber 8043, Page 464

10.   An agreement, upon and subject to all of the provisions contained therein.

   By and Between:    Bernard K. Naeole and Diane M. Naeole, Husband and Wife "Owners", and the County of Maui and its Department of Water Supply "County"
   Dated:          March 13, 1987
   Recording Date:March 19, 1987
   Recording No.:  Book 20476, Page 165

## SCHEDULE B
(continued)

11. The following qualifying language applies to any and all covenants, conditions and restrictions (CC&R's) set forth in the numbered items above:

But omitting any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

**END OF SCHEDULE B - PART I**

## SCHEDULE B

## PART II

1.     A mortgage to secure an indebtedness as shown below

|  |  |
|---|---|
| Amount: | $690,000.00 |
| Dated: | January 12, 2017 |
| Mortgagor: | Maui Meadows Management, LLC, a Hawaii Limited Liability Company |
| Mortgagee: | 3343 KD, LLC, a Colorado limited liability company |
| Loan No.: | None Shown |
| Recording Date: | January 18, 2017 |
| Recording No: | A-62270705 |

2.     A mortgage to secure an indebtedness as shown below

|  |  |
|---|---|
| Amount: | $1,050,000.00 |
| Dated: | March 27, 2018 |
| Mortgagor: | Maui Meadows Management, LLC, a Hawaii Limited Liability Company |
| Mortgagee: | Velocity Commercial Capital, LLC, a California Limited Liability Company |
| Loan No.: | None Shown |
| Recording Date: | April 3, 2018 |
| Recording No: | A-66670104 |

**END OF SCHEDULE B - PART II**

# SCHEDULE C

**ADDRESSES**

| Paragraph No. | Recording Information | Mailing Address |
|---|---|---|
| N/A | | Maui Meadows Management, LLC<br>3343 Keha Drive<br>Kihei, HI 96753 |
| | | Maui Meadows Management, LLC<br>PO Box 1039<br>Kihei HI 96753 |
| | | Maui Meadows Management, LLC<br>616 Laniolu Street<br>Kihei HI 96753 |
| N/A | | Director of Finance<br>Attn: Collection Division Administrator<br>P.O. Box 259<br>Honolulu, HI 96809 |
| Schedule B, Part I, Item #7 | | Director of Finance<br>70 East Kaahumanu Avenue, Suite A-16<br>Kahului, HI 96732 |
| Schedule B, Part II, Item #1 | Mortgage, Recording No. A-62270705 | 3343 KD, LLC, a Colorado limited liability company<br>793 Cemetery Lani<br>Aspen, CO 81611 |
| Schedule B, Part II, Item #2 | Mortgage, Recording No. A-66670104 | Velocity Commercial Capital, LLC, a California Limited Liability Company<br>616 Laniolu Street<br>Kihei, Hi 96753 |

# END OF SCHEDULE C

# EXCLUSIONS FROM COVERAGE

Except as expressly provided by the assurances in Schedule A, the Company assumes no liability for loss or damage by reason of the following:

(1) Defects, liens, encumbrances, adverse claims or other matters affecting the title to any property beyond the lines of the Land.

(2) Defects, liens, encumbrances, adverse claims or other matters, whether or not shown by the Public Records (a) that are created, suffered, assumed or agreed to by one or more of the Assureds; or (b) that result in no loss to the Assured.

(3) Defects, liens, encumbrances, adverse claims, encroachments, violations, or other matters not shown by the Public Records.

(4) The identity of any party shown or referred to in any of the schedules of this Guarantee.

(5) The validity, legal effect or priority of any matter shown or referred to in any of the schedules of this Guarantee.

(6) (a) Taxes or assessments of any taxing authority that levies taxes or assessments on real property; or (b) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not the matters excluded under (a) or (b) are shown by the records of the taxing authority or by the Public Records.

(7) (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excluded under (a), (b) or (c) are shown by the Public Records.

(8) (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;

    (ii) the character, dimensions or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations.

    (b) Any governmental police power,

Unless a notice, describing any part of the Land, is recorded in the Public Records setting forth a violation of or intention to enforce (a) or (b) above, but only to the extent of the violation or enforcement referred to in that notice.

(9) Rights of eminent domain unless a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

(10) Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

    (a) a fraudulent conveyance or fraudulent transfer; or

    (b) a preferential transfer for any reason.

(11) Claims arising out of customary and traditional rights and practices, including without limitation those exercised for subsistence, cultural, religious, access or gathering purposes, as provided for in the Hawaii Constitution or the Hawaii Revised Statutes.

(12) Rights or claims of persons or entities other than the Insured involving or arising out of: mineral or metallic mines; geothermal resources; water; fishing, commerce or navigation; creation or loss of the Land or any portion thereof by accretion, avulsion, erosion or artificial means; persons residing on or otherwise in possession of the Land or any portion thereof; trails, roadways or other rights of way, including without limitation any such rights or claims under Chapter 264, Hawaii Revised Statutes.

(13) Any lien (or claim of lien) for services, labor or material arising from an improvement or work related to the Land, whether furnished before or after Date of Policy and regardless of the legal effective date of any such lien or claim, unless at the Date of Guarantee such lien or claim was recorded in the Public Records or filed in the Circuit Court pursuant to Chapter 507, Hawaii Revised Statutes.

(14) Any claim arising as a result of the inability or failure of the Assured to comply with applicable doing business laws of the State of Hawaii.

# GUARANTEE CONDITIONS

## 1. DEFINITION OF TERMS

The following terms when used in the Guarantee, including the Exclusions and Conditions, mean:

(a) the "Assured": the party or parties named as the Assured in Schedule A, or on a supplemental writing executed by the Company.

(b) "Land": the Land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "Land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways.

(c) "Mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(d) "Public Records": the records maintained in the State of Hawaii by the following offices only: (a) the Office of the Clerk of the District Court of the United States for the District of Hawaii; (b) the Office of the Clerk of the Bankruptcy Court for the District of Hawaii; (c) the Offices of the Clerk of the Circuit Courts of the State of Hawaii; (d) the Office of the Registrar of Conveyances of the State of Hawaii; and (e) the Office of the Assistant Registrar of the Land Court of the State of Hawaii; at Date of Guarantee, for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge.

(e) "Date of Guarantee": the Date of Guarantee set forth in Schedule A.

(f) "Amount of Liability": the Amount of Liability as stated in Schedule A.

(continued)

**2. NOTICE OF CLAIM TO BE GIVEN BY ASSURED**

The Assured shall notify the Company promptly in writing in case knowledge shall come to the Assured of any assertion of facts, or claim of title or interest that is contrary to the assurances set forth in Schedule A and that might cause loss or damage for which the Company may be liable under this Guarantee. If prompt notice shall not be given to the Company, then all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of the Assured under this Guarantee unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**3. NO DUTY TO DEFEND OR PROSECUTE**

The Company shall have no duty to defend or prosecute any action or proceeding to which the Assured is a party, notwithstanding the nature of any allegation in such action or proceeding.

**4. COMPANY'S OPTION TO DEFEND OR PROSECUTE ACTIONS; DUTY OF ASSURED TO COOPERATE**

Even though the Company has no duty to defend or prosecute as set forth in Paragraph 3 above:

(a) The Company shall have the right, at its sole option and cost, to institute and prosecute any action or proceeding, interpose a defense, as limited in Paragraph 4 (b), or to do any other act which in its opinion may be necessary or desirable to establish the correctness of the assurances set forth in Schedule A or to prevent or reduce loss or damage to the Assured. The Company may take any appropriate action under the terms of this Guarantee, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this Guarantee. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(b) If the Company elects to exercise its options as stated in Paragraph 4 (a) the Company shall have the right to select counsel of its choice (subject to the right of the Assured to object for reasonable cause) to represent the Assured and shall not be liable for and will not pay the fees of any other counsel, nor will the Company pay any fees, costs or expenses incurred by an Assured in the defense of those causes of action which allege matters not covered by this Guarantee.

(c) Whenever the Company shall have brought an action or interposed a defense as permitted by the provisions of this Guarantee, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from an adverse judgment or order.

(d) In all cases where this Guarantee permits the Company to prosecute or provide for the defense of any action or proceeding, the Assured shall secure to the Company the right to so prosecute or provide for the defense of any action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the Assured for this purpose. Whenever requested by the Company, the Assured, at the Company's expense, shall give the Company all reasonable aid in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or lawful act which in the opinion of the Company may be necessary or desirable to establish the correctness of the assurances set forth in Schedule A or to prevent or reduce loss or damage to the Assured. If the Company is prejudiced by the failure of the Assured to furnish the required cooperation, the Company's obligations to the Assured under the Guarantee shall terminate.

**5. PROOF OF LOSS OR DAMAGE**

(a) In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Assured furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

(b) In addition, the Assured may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Guarantee, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Assured shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the Assured provided to the Company pursuant to this paragraph shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Assured to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in the above paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this Guarantee to the Assured for that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS: TERMINATION OF LIABILITY**

In case of a claim under this Guarantee, the Company shall have the following additional options:

(a) To pay or tender payment of the Amount of Liability together with any costs, attorneys' fees, and expenses incurred by the Assured that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.

(b) To pay or otherwise settle with the Assured any claim assured against under this Guarantee. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Assured that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(c) To pay or otherwise settle with other parties for the loss or damage provided for under this Guarantee, together with any costs, attorneys' fees, and expenses incurred by the Assured that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in 6 (a), (b) or (c) of this paragraph the Company's obligations to the Assured under this Guarantee for the claimed loss or damage, other than the payments required to be made, shall terminate, including any duty to continue any and all litigation initiated by the Company pursuant to Paragraph 4.

(continued)

**7. LIMITATION OF LIABILITY**

(a) This Guarantee is a contract of Indemnity against actual monetary loss or damage sustained or incurred by the Assured claimant who has suffered loss or damage by reason of reliance upon the assurances set forth in Schedule A and only to the extent herein described, and subject to the Exclusions From Coverage of this Guarantee.

(b) If the Company, or the Assured under the direction of the Company at the Company's expense, removes the alleged defect, lien, or encumbrance or cures any other matter assured against by this Guarantee in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(c) In the event of any litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom.

(d) The Company shall not be liable for loss or damage to the Assured for liability voluntarily assumed by the Assured in settling any claim or suit without the prior written consent of the Company.

**8. REDUCTION OF LIABILITY OR TERMINATION OF LIABILITY**

All payments under this Guarantee, except payments made for costs, attorneys' fees and expenses pursuant to Paragraph 4 shall reduce the Amount of Liability under this Guarantee pro tanto.

**9. PAYMENT OF LOSS**

(a) No payment shall be made without producing this Guarantee for endorsement of the payment unless the Guarantee has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions, the loss or damage shall be payable within thirty (30) days thereafter.

**10. SUBROGATION UPON PAYMENT OR SETTLEMENT**

Whenever the Company shall have settled and paid a claim under this Guarantee, all right of subrogation shall vest in the Company unaffected by any act of the Assured.

The Company shall be subrogated to and be entitled to all rights and remedies which the Assured would have had against any person or property in respect to the claim had this Guarantee not been issued. If requested by the Company, the Assured shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Assured shall permit the Company to sue, compromise or settle in the name of the Assured and to use the name of the Assured in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the Assured the Company shall be subrogated to all rights and remedies of the Assured after the Assured shall have recovered its principal, interest, and costs of collection.

**11. ARBITRATION**

Either the Company or the Assured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Assured arising out of or relating to this Guarantee, any service of the Company in connection with its issuance or the breach of a Guarantee provision, or to any other controversy or claim arising out of the transaction giving rise to this Guarantee. All arbitrable matters when the amount of liability is Two Million And No/100 Dollars ($2,000,000) or less shall be arbitrated at the option of either the Company or the Assured. All arbitrable matters when the amount of liability is in excess of Two Million And No/100 Dollars ($2,000,000) shall be arbitrated only when agreed to by both the Company and the Assured. Arbitration pursuant to this Guarantee and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

PROVIDED, that this section does not supersede Hawaii's Uniform Arbitration Act, Hawaii Revised Statutes, Chapter 658A, which Chapter controls.

**12. LIABILITY LIMITED TO THIS GUARANTEE; GUARANTEE ENTIRE CONTRACT**

(a) This Guarantee together with all endorsements, if any, attached hereto by the Company is the entire Guarantee and contract between the Assured and the Company. In interpreting any provision of this Guarantee, this Guarantee shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, or any action asserting such claim, shall be restricted to this Guarantee.

(c) No amendment of or endorsement to this Guarantee can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**13. SEVERABILITY**

In the event any provision of this Guarantee, in whole or in part, is held invalid or unenforceable under applicable law, the Guarantee shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**14. CHOICE OF LAW; FORUM**

(a) Choice of Law: The Assured acknowledges the Company has underwritten the risks covered by this Guarantee and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of Guaranties of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims that are adverse to the Assured and to interpret and enforce the terms of this Guarantee. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Assured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

(continued)

**15. NOTICES, WHERE SENT**
All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this Guarantee and shall be addressed to the Company at:

Fidelity National Title Insurance Company
P.O. Box 45023
Jacksonville, FL 32232-5023
Attn: Claims Department

**END OF CONDITIONS**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | CASE NO. 21-00952 |
| STEVEN MICHAEL WARSH, | (Chapter 13) |
| Debtor. | CERTIFICATE OF SERVICE |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of *U.S. Bank National Association, As Trustee For Velocity Commercial Capital Loan Trust 2018-2's Motion For Order Confirming That Automatic Stay And Co-Debtor Stay Are Not Applicable* was duly served upon the below parties via JEFS on the date indicated below.

CAIN & HERREN, ALC
ATTORNEYS AT LAW
MICHAEL J. COLLINS, ESQ.
2141 W. Vineyard Street
Wailuku, Hawai'i 96793

Attorney for Debtor
Steven M. Warsh

DATED: Honolulu, Hawaiʻi, October 28, 2021

*/s/ Tom E. Roesser*

TOM E. ROESSER
ERIKA S. GUSTIN

Attorneys for Creditor
U.S. BANK NATIONAL ASSOCIATION, AS
TRUSTEE FOR VELOCITY COMMERCIAL
CAPITAL LOAN TRUST 2018-2